[No. H033631. Sixth Dist. Aug. 30, 2010.]

AJAXO INC., Plaintiff and Appellant, v.
E*TRADE FINANCIAL CORPORATION, Defendant and Respondent.

**COUNSEL**

Diemer, Whitman & Cardosi, Kathryn S. Diemer and John P. Cardosi for Plaintiff and Appellant.

Morgan, Lewis & Bockius, Joseph E. Floren, Brett M. Schuman and Michael P. Monagle for Defendant and Respondent.

## OPINION

**PREMO, J.**—Plaintiff Ajaxo Inc. (Ajaxo) sued defendant E*Trade Financial Corporation (E*Trade) for misappropriation of trade secrets under California's Uniform Trade Secrets Act (Civ. Code, §§ 3426–3426.11; CUTSA).[1] E*Trade's liability was established in a prior trial where a jury determined that E*Trade had willfully and maliciously misappropriated Ajaxo's trade secrets. (See *Ajaxo Inc. v. E*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 26 [37 Cal.Rptr.3d 221] (*Ajaxo I*).) This matter comes to us following the second trial in which the single factual dispute before the jury was the extent to which E*Trade had been unjustly enriched by its misappropriation.

Under the CUTSA, Ajaxo was entitled to recover damages for its actual loss caused by the misappropriation and also for E*Trade's unjust enrichment not taken into account in computing Ajaxo's actual loss. (§ 3426.3, subd. (a).) If neither actual loss nor unjust enrichment were "provable," the trial court had discretion to order E*Trade to pay Ajaxo a reasonable royalty. (§ 3426.3, subd. (b).)[2] Electing to pursue damages measured only by E*Trade's unjust enrichment, Ajaxo submitted evidence intending to show that E*Trade had been enriched by more than $300 million. The jury rejected the evidence, accepting instead E*Trade's data, which showed that E*Trade had lost over $2 million. That is, E*Trade's net "enrichment" was less than zero. But when Ajaxo asked the trial court to award reasonable royalties, the court rejected the request, concluding that unjust enrichment was "provable," there was just "no net amount in terms of actual damages." Ajaxo argues on appeal that this was error. We agree.

The jury verdict demonstrates that E*Trade lost money; it was not enriched by its misappropriation of Ajaxo's trade secrets. Unjust enrichment may have been theoretically "provable" since there was evidence that could have supported a monetary award, but in the end it was not proved. Section 3426.3, subdivision (b) does not impose a theoretical or speculative standard of provability. The standard is factual. A measure of damages may not be provable for lack of sufficient evidence. Or it may not be proved, as happened

---

[1] Further unspecified section references are to the Civil Code.

[2] Section 3426.3 provides in full: "(a) A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss. [¶] (b) If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited. [¶] (c) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b)."

here, where the jury concludes that the defendant did not profit from its wrongdoing. Either way, it is not provable for purposes of section 3426.3, subdivision (b).

Ajaxo raises several additional arguments pertaining to the trial court's pretrial rulings. We reject each of those. We shall reverse the judgment and remand the matter for further proceedings as described below.

## I. Factual Background[3]

In September 1999, E*Trade, an Internet-based financial services company, entered into a nondisclosure agreement (NDA) with Ajaxo by which E*Trade agreed to maintain the confidence of information it received while evaluating Ajaxo's wireless stock trading software. (*Ajaxo I, supra*, 135 Cal.App.4th at p. 27.) At the time, E*Trade clients could trade stocks via the Internet but could not use wireless hand-held devices to do so. E*Trade was looking for a partner with which it could develop a wireless stock trading capability. (*Id.* at p. 35.) Ajaxo offered to license its product to E*Trade for $860,000. (*Id.* at p. 30.) E*Trade made a counteroffer but ultimately withdrew it, claiming that Ajaxo was too small to be an E*Trade partner. (*Id.* at p. 32.)

In December 1999, E*Trade selected Everypath Inc. (Everypath) as its wireless vendor, even though Everypath did not then have a suitable wireless product. Within a couple of months, however, Everypath raised sufficient venture capital to finance its development of the wireless technology E*Trade was looking for. In March 2000, E*Trade and Everypath entered into a service provider agreement pursuant to which Everypath was to provide E*Trade with wireless trading capability. (*Ajaxo I, supra*, 135 Cal.App.4th at p. 33.)

Evidence produced at the first trial showed that E*Trade was connected to Everypath both financially and through its personnel. Everypath had obtained funding from a venture capital fund managed by Arrowpath Ventures LLC, which employed former E*Trade employees. In addition, E*Trade had contributed 25 percent of the capital in the venture capital fund, giving E*Trade an indirect financial stake in Everypath. (*Ajaxo I, supra*, 135 Cal.App.4th at p. 34.)

---

[3] Our summary of the factual and procedural backgrounds is a much abbreviated version of the extensive background included in *Ajaxo I, supra*, 135 Cal.App.4th at pages 27–41. We include here only those portions necessary to a full understanding of the issues in this case.

Ajaxo soon suspected that Everypath's development of the wireless trading technology had been facilitated by E*Trade's misappropriation of trade secrets that Ajaxo had communicated to E*Trade under the NDA. Ajaxo believed that E*Trade had disclosed the trade secrets to Everypath and that Everypath, with knowledge of the illegitimate source of the information, used them to develop the technology it sold back to E*Trade.

## II. Procedural Background

Ajaxo sued both E*Trade and Everypath, alleging a cause of action for breach of contract against E*Trade and a CUTSA cause of action against both defendants. (*Ajaxo I, supra*, 135 Cal.App.4th at p. 40.) Prior to the first trial, Ajaxo intended to put on evidence of both its actual losses and defendants' unjust enrichment resulting from the misappropriation. Ajaxo had retained an expert witness who was prepared to testify that Ajaxo's lost profits amounted to more than $39 million. (*Id.* at p. 59.) Ajaxo withdrew the expert after E*Trade moved to exclude the expert's testimony but before the trial court ruled upon E*Trade's motion. At trial, Ajaxo relied solely upon an unjust enrichment measure of damages.

At the close of Ajaxo's case-in-chief in the first trial, the trial court partially granted defendants' motion for nonsuit on the CUTSA cause of action, holding that Ajaxo had not submitted sufficient evidence of damages for misappropriation (as measured by E*Trade's unjust enrichment). The court did allow the jury to determine liability under the CUTSA, recognizing that Ajaxo might be entitled to reasonable royalties if defendants had indeed misappropriated the trade secrets. (*Ajaxo I, supra*, 135 Cal.App.4th at p. 40.) The jury found that E*Trade had breached the NDA and awarded Ajaxo $1.29 million for that claim.[4] (*Ibid.*) The jury also found that both defendants had willfully and maliciously misappropriated the trade secrets, but it did not make a monetary award because it had not been asked to do so. (*Id.* at pp. 25–26.)

In its first appeal, Ajaxo argued that the trial court had erred by taking the damages issue from the jury. This court agreed. We noted that Ajaxo had based its contract cause of action upon the same facts it used to prove the misappropriation claim; the two causes of action were "inextricably linked." (*Ajaxo I, supra*, 135 Cal.App.4th at p. 63.) Further, the only theory of recovery Ajaxo had pursued on its claim for breach of contract was the theory

---

[4] As it happens, $1.29 million is exactly 1.5 times $860,000, the amount for which Ajaxo had offered to license its product to E*Trade.

of unjust enrichment. The same evidence Ajaxo had presented to prove its contract damages would have been sufficient to prove unjust enrichment resulting from E*Trade's misappropriation. There was also evidence upon which the jury could have found Everypath to have been unjustly enriched. (*Id.* at p. 64.) *Ajaxo I* concluded, therefore, that the trial court had erred in finding insufficient evidence of defendants' unjust enrichment resulting from the misappropriation and remanded for a new trial on that issue. (*Ibid.*) The $1.29 million judgment in favor of Ajaxo on the contract cause of action was unaffected by our decision in *Ajaxo I.*

## III. The Second Trial

By the time of the second trial, Everypath was out of business and had made an assignment for the benefit of its creditors. Everypath turned out to be "a complete write-off, go to zero, complete loss." The trial court bifurcated the case against Everypath so that the matter proceeded against E*Trade only. In other pretrial rulings the trial court excluded evidence pertaining to the financing of Everypath and any evidence relating to the supposed joint liability of E*Trade and Everypath. The court also refused to admit copies of E*Trade's 10-K statements filed with the Securities and Exchange Commission.[5] We shall describe these rulings in more detail in the discussion below.

At trial, Ajaxo's evidence of E*Trade's unjust enrichment included evidence of the price at which it had offered to license its product and the price E*Trade suggested in response. It also included the testimony of Ajaxo's expert, Walter Bratic, who opined that E*Trade's misappropriation was responsible for 25 percent of the profit generated by all E*Trade clients who opened accounts from September 1999 through December 2002, the period of time during which E*Trade had presumably been using the misappropriated trade secrets. Bratic assumed that because wireless trading was one of the four primary business strategies E*Trade had identified in its 10-K filings, one-fourth of all new accounts opened during the relevant time period had been opened because E*Trade was able to offer wireless trading. One-fourth of the profit generated from all new accounts opened during the pertinent time period was about $301 million. Bratic did not consider E*Trade's actual profits from wireless trading or the fact that no more than one-half of 1 percent of E*Trade clients ever traded on wireless devices. At the close of Ajaxo's case-in-chief, E*Trade moved for nonsuit. The trial court denied the

---

[5] Under federal securities laws, publicly traded companies must submit an annual report on form 10-K. "The annual report on Form 10-K provides a comprehensive overview of the company's business and financial condition and includes audited financial statements." (<http://www.sec.gov/answers/form10k.htm> [as of Aug. 30, 2010].)

motion, concluding that there was enough evidence "to go to the jury" on the issue of E*Trade's unjust enrichment.

E*Trade then produced evidence to show that its wireless trading strategy had been less successful than anticipated. The market for wireless trading peaked in March 2000 and declined from there. Joseph Raymond, an E*Trade employee, prepared a summary of revenue and expenses related to wireless trading for the period during which E*Trade had been using the misappropriated trade secrets. The summary (exhibit No. 233) showed that E*Trade's wireless trading expenses—wireless transactional costs, team costs (labor devoted to the wireless project), and monthly service provider fees paid to Everypath—exceeded wireless trading commissions every quarter, resulting in a loss of about $2.5 million. Relying upon E*Trade's quarterly financial statements, Everypath invoices, and team costs listed in exhibit No. 233, E*Trade's expert, Terry Lloyd, opined that E*Trade had lost approximately $2.4 million. An alternate calculation resulted in a net loss of about $1.8 million. Wireless trading "didn't pan out."

The jury was instructed that the amount of E*Trade's unjust enrichment was "the value of E*Trade's benefit that would not have been achieved except for its misappropriation" less "the amount [of] E*Trade's reasonable expenses . . . ." The jury found that the value of the benefit conferred upon E*Trade by the misappropriation was $3,990,852 and that E*Trade's reasonable expenses were $6,411,761, resulting in a net loss of approximately $2.4 million.

Following the verdict, Ajaxo asked the trial court to make an award of reasonable royalties under section 3426.3, subdivision (b), which, as we noted above, permits such an award if neither actual loss nor unjust enrichment is "provable." E*Trade opposed the request, arguing that both actual losses and unjust enrichment were provable because there was evidence in the record to support either measure of damages. The trial court found that unjust enrichment was provable because the jury "found that Ajaxo had proven unjust enrichment damages against E*Trade with no net amount in terms of actual damages." Based upon this finding, the trial court denied Ajaxo's request for reasonable royalties and did not reach the question whether actual losses were provable. The trial court rejected Ajaxo's requests for exemplary damages and for an injunction and denied its new trial motion. Judgment was entered in favor of E*Trade. This timely appeal followed.

### IV. Contentions

Ajaxo raises three issues on appeal. First, Ajaxo argues that the trial court erred in excluding evidence of investments in Everypath, which, Ajaxo claims,

would have supported its unjust enrichment claim against E\*Trade. Second, Ajaxo maintains that the trial court erred in excluding E\*Trade's 10-K forms because they would have been useful to impeach E\*Trade's revenue calculations. Finally, Ajaxo contends that the trial court had discretion to award reasonable royalties under section 3426.3, subdivision (b) because the verdict demonstrated that unjust enrichment is not provable.

## V. Discussion

### A. Everypath Investment Evidence

Prior to trial, E\*Trade moved to limit the opinions of Ajaxo's damages expert, Walter Bratic. Bratic had offered three alternative theories of unjust enrichment. In addition to his primary theory based upon the percentage of new clients acquired during the pertinent time period, Bratic posited that E\*Trade had been benefitted by Everypath's receipt of $63.5 million in venture funding just a few months after E\*Trade first disclosed the trade secrets to Everypath. Bratic's second alternative theory was that E\*Trade had been unjustly enriched by $60 million, the market value Bratic assigned to . Ajaxo's trade secret based upon the increased valuation of Everypath.

The trial court granted E\*Trade's motions in limine to exclude Bratic's two alternative theories, explaining that the investment in Everypath was not relevant to determining the unjust enrichment of E\*Trade. "I just don't see the connection. I think it will confuse the jury. There would be large numbers out there that are just unrelated to the issue of how much E\*Trade benefitted. It may be perfectly admissible as to Everypath, but not as to E\*Trade." For the same reasons, the court also excluded an Arrowpath Web page, which stated that Everypath's codevelopment of the wireless technology with E\*Trade had led directly to a successful financing of $60 million, and any evidence of public offerings and other financing of Everypath. Ajaxo maintains that the evidence was relevant.

We review the trial court's ruling for abuse of discretion. "Specifically, [the appellate court] scrutinizes a decision on a motion to bar the introduction of evidence as irrelevant for such abuse: it does so because it so [sic] examines the underlying determination whether the evidence is indeed irrelevant." (*People v. Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

■ To be relevant, evidence of financial investments in Everypath had to have some tendency in reason to prove the amount by which E\*Trade had

been unjustly enriched by its misappropriation of Ajaxo's trade secret. (Evid. Code, § 210.) A defendant's unjust enrichment is typically measured by the defendant's profits flowing from the misappropriation. A defendant's profits often represent profits the plaintiff would otherwise have earned. (Rest.3d Restitution (Tent. Draft No. 4) § 42, com. d.) Where the plaintiff's loss does not correlate directly with the misappropriator's benefit, as is the case here, the problem becomes more complex. There is no standard formula to measure it. A defendant's unjust enrichment might be calculated based upon cost savings or increased productivity resulting from use of the secret. (*Bourns, Inc. v. Raychem Corp.* (9th Cir. 2003) 331 F.3d 704, 709–710.)[6] Increased market share is another way to measure the benefit to the defendant. (*Medical Staffing Network, Inc. v. Ridgway* (2009) 194 N.C.App. 649 [670 S.E.2d 321, 330].) Recovery is not prohibited just because the benefit cannot be precisely measured. But as with any other pecuniary remedy, there must be some reasonable basis for the computation. (Cf. *Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 398 [112 Cal.Rptr.2d 99].)

Another crucial point is that unjust enrichment, as the phrase is used here, is, in effect, synonymous with restitution. (*Dinosaur Development, Inc. v. White* (1989) 216 Cal.App.3d 1310, 1314 [265 Cal.Rptr. 525].) " ' "The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of or for *property or benefits received* under such circumstances as to give rise to a legal or equitable obligation to account therefor." ' " (*Id.* at p. 1315, italics added, quoting *Lucky Auto Supply v. Turner* (1966) 244 Cal.App.2d 872, 885 [53 Cal.Rptr. 628].)

The increase in Everypath's capitalization is not a reasonable basis upon which to compute E*Trade's unjust enrichment because it does not represent *property or benefits received by E*Trade*. The capitalization of Everypath may have indirectly benefitted E*Trade because it allowed Everypath to develop the wireless trading technology that E*Trade ultimately used to offer wireless trading to its customers. But that benefit is measured by the profit E*Trade earned by using the wireless technology, evidence of which was introduced at trial.

The only other way E*Trade could have benefitted from the investment in Everypath was through E*Trade's stake in the Arrowpath venture capital

---

[6] The CUTSA is derived from the national Uniform Trade Secrets Act (Uniform Act). (Stats. 1984, ch. 1724, § 1, pp. 6252–6253.) Case law from other jurisdictions interpreting uniform statutory provisions can be helpful in construing similar sections of the CUTSA. (*Estate of Reeves* (1991) 233 Cal.App.3d 651, 657 [284 Cal.Rptr. 650]; see also *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 955–956 [90 Cal.Rptr.3d 247].) Accordingly, where California law is silent, we shall refer to cases from other jurisdictions to the extent they construe or explain provisions of the Uniform Act that are similar to the corresponding sections of the CUTSA.

fund. E*Trade undoubtedly hoped to realize some return on that investment. If it had, E*Trade might be liable in restitution to Ajaxo. But Ajaxo could not show that E*Trade ever realized any return on that investment at all.

Ajaxo argues that the increased capitalization of Everypath established the market value of the secrets E*Trade misappropriated. In support, Ajaxo cites the Restatement of Restitution, section 151, which provides, "Where a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition . . . ." (Boldface omitted.) This section of the Restatement is inapplicable to the present situation. E*Trade did not obtain exclusive possession of the secrets, and, therefore, was not benefitted to the extent of their full market value. As comment (a) to section 151 of the Restatement of Restitution makes clear, the section applies only when the plaintiff has been "deprived" of title to or possession of the property. Here, Ajaxo was not deprived of its secrets. Other than disclosing them to Everypath, E*Trade did not publish the secrets. Ajaxo retained possession of the secrets and could still license its technology to others. Under the common law, "Where the plaintiff retains the use of the secret, as here, and where there has been no effective disclosure of the secret through publication the total value of the secret to the plaintiff is an inappropriate measure [of damages for misappropriation]." (*University Computing Co. v. Lykes-Youngstown Corp.* (5th Cir. 1974) 504 F.2d 518, 535, fn. omitted (*University Computing*).)

We recognize that in *Ajaxo I,* we held that evidence of investments in Everypath was relevant to the issue of E*Trade's liability. (See *Ajaxo I, supra,* 135 Cal.App.4th at pp. 45–46.) But liability was not at issue in the proceedings presently on review. It is for that reason we also reject Ajaxo's suggestion that the investment evidence is relevant because E*Trade and Everypath are jointly liable. The remittitur called for a retrial on the issue of damages only. Prior to the second trial, the trial court denied Ajaxo's motion to establish that E*Trade was jointly and severally liable for any unjust enrichment enjoyed by Everypath, and it granted E*Trade's motion to exclude evidence of joint and several liability. Accordingly, evidence of the investment capital Everypath received as a result of the misappropriation was not relevant to any disputed issue of fact in the second trial, so the trial court did not err in excluding it.

### B. The 10-K Forms

Ajaxo next argues that the trial court abused its discretion in excluding E*Trade's 10-K forms filed during the time E*Trade was making use of the

trade secrets. The trial court denied Ajaxo's pretrial request for judicial notice of the forms and excluded the documents from evidence. Later in the trial, after considering whether to admit portions of the 10-K statements, the trial court stood by its earlier ruling, stating, "I'm not going to allow the 10-Ks in, any part of it. I'm going to go back to my original ruling. These documents are complex. They're confusing. I think to give context you have to give them more than they possibly need. The experts relied on them. They testified from them. So for the record, that evidence that you need, if you're talking about four pillars of whatever it is, it's all here anyway. So I'm going to deny that."

Ajaxo now argues that the documents are relevant to the credibility of E*Trade's financial evidence. In particular, the 10-K form for 2002 shows E*Trade's commission revenues for 2001 as $377,704,000, whereas the corresponding figure reported in exhibit No. 233 is approximately $20 million less than that. Ajaxo argues that it could have used this discrepancy to attack the figures in exhibit No. 233, which is the evidence upon which the jury apparently relied. Ajaxo concedes that it did not seek to admit the evidence for the purpose of impeachment and did not raise that basis for its admissibility until it made its motion for new trial. Accordingly, the argument necessarily relates to the trial court's decision denying that motion. When we review an order denying a new trial we review the entire record, including the evidence, and make an independent determination as to whether the claimed error was prejudicial. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872 [135 Cal.Rptr. 647, 558 P.2d 545].) Having reviewed the record, we detect no prejudice here.

In excluding the 10-K forms, the trial court implicitly relied upon Evidence Code section 352, which permits the exclusion of relevant evidence where its probative value is substantially outweighed by the risk that admitting the evidence will "necessitate undue consumption of time" or "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." It is not reasonably likely that, had Ajaxo sought to admit the 10-K forms for impeachment, the trial court would have ruled any differently than it did initially. The forms were "complex" and "confusing" and contained a plethora of irrelevant data that could have prejudiced the jury against E*Trade based solely upon its multimillion-dollar revenue stream. Using the forms for impeachment would not have changed that. Moreover, if the forms had been admitted to point out the $20 million discrepancy, E*Trade would almost certainly have offered some explanation for the difference, whether by showing how the figures were calculated or even by admitting some arithmetic error. Whatever the explanation, it would just have added to the confusion.

The thrust of Ajaxo's argument is that if the jury had been alerted to the fact that exhibit No. 233 underreported 2001 revenue by $20 million it might have rejected the rest of the data contained in exhibit No. 233. But exclusion of the documents did not prevent Ajaxo from highlighting that discrepancy. Ajaxo could have pointed out the inconsistency in its examination of its own expert, who relied upon the 10-K forms in forming his opinions. Moreover, even if Ajaxo had highlighted the discrepancy, a different result is not reasonably probable. Although $20 million is a lot of money, it is less than 6 percent of the annual revenue reported in any of the documents. A 6 percent adjustment of each of the figures in exhibit No. 233 would still result in a net profit from wireless trading of significantly less than zero. In short, Ajaxo was not unfairly prejudiced by exclusion of the 10-K forms.

### C. Reasonable Royalties

#### 1. Introduction

■ Ajaxo's final argument is that the trial court erred in refusing to consider an award of reasonable royalties. A reasonable royalty is a court-determined fee imposed upon a defendant for his or her use of a misappropriated trade secret. Under the CUTSA, reasonable royalties are allowed in two situations. In the context of injunctive relief reasonable royalties may be imposed where it would be unreasonable to enjoin future use of a misappropriated trade secret. (§ 3426.2, subd. (b).) When calculating a monetary remedy for the past use of a misappropriated trade secret, a court "may order" reasonable royalties "[i]f neither damages [for actual loss] nor unjust enrichment caused by misappropriation are provable." (§ 3426.3, subd. (b).) Ajaxo's argument relates to the latter situation. In that situation a reasonable royalty is an attempt " 'to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff. By means of a "suppositious meeting" between the parties, the court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred.' " (*Vermont Microsystems, Inc. v. Autodesk, Inc.* (2d Cir. 1998) 138 F.3d 449, 451 (*Vermont Microsystems*); and see *University Computing, supra*, 504 F.2d at p. 538.)

It is settled that, in fashioning a pecuniary remedy under the CUTSA for past use of a misappropriated trade secret, the trial court may order a reasonable royalty only where "neither actual damages to the holder of the trade secret nor unjust enrichment to the user is provable." (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1529 [66 Cal.Rptr.2d 731].) "California law differs on this point from both the [Uniform Act] and Federal patent law, neither of which require[s] actual damages and unjust enrichment to be unprovable before a reasonable royalty may be imposed." (*Cacique, Inc. v.*

*Robert Reiser & Co., Inc.* (9th Cir. 1999) 169 F.3d 619, 623; see 14 West's U. Laws Ann. (2005) U. Trade Secrets Act, § 3, subd. (a), pp. 633–634 [reasonable royalties available "[i]n lieu of damages measured by any other methods"]; 35 U.S.C. § 284 [claimant is entitled to compensation for patent infringement, "in no event less than a reasonable royalty"].)

In the present case, Ajaxo did not prove either its actual loss or E*Trade's unjust enrichment. Nevertheless, the trial court held that unjust enrichment was "provable" and rejected Ajaxo's request for reasonable royalties on that basis. For reasons we shall explain, this was error.

## 2. Unjust Enrichment

Ajaxo argues that unjust enrichment was not "provable" because, after all, the jury's verdict shows that E*Trade was not enriched. E*Trade maintains that, since Ajaxo had sufficient evidence of unjust enrichment to support a monetary award had the jury chosen to believe it, unjust enrichment was "provable," it was just not proved. In effect, E*Trade's position is that to be unprovable within the meaning of section 3426.3, subdivision (b), a measure of damages must fail as a matter of law, as opposed to the situation here, where the measure was not proved as a matter of fact.

■ Whether E*Trade's unjust enrichment was "provable" within the meaning of section 3426.3, subdivision (b) depends upon how we interpret that statutory provision. This is a purely legal question calling for the independent standard of review. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) In undertaking that review, "[o]ur fundamental task is to ascertain the intent of the lawmakers. [Citation.] If there is no ambiguity in the language of the statute, then the plain meaning of the language governs. [Citation.] If the statutory language permits more than one reasonable interpretation, we may consider various extrinsic aids, including examination of the evils to be remedied and the legislative scheme encompassing the statute in question. [Citations.] We select the interpretation that comports most closely with the apparent intent of the Legislature, with a view toward promoting, rather than defeating, the general purpose of the statute and avoiding an interpretation that would lead to absurd consequences." (*Cypress Semiconductor Corp. v. Superior Court* (2008) 163 Cal.App.4th 575, 581 [77 Cal.Rptr.3d 685].)

■ It is certainly true that where the evidence of a measure of damages is insufficient as a matter of law that measure of damages is not "provable." This is illustrated by the two cases Ajaxo cites. In *Vermont Microsystems, supra*, 138 F.3d 449, 450, the evidence was " 'too imprecise and speculative' " to support a finding of either the plaintiff's actual losses or the

defendant's unjust enrichment, so reasonable royalties were allowable under the CUTSA. In *02 Micro Internat. Ltd. v. Monolithic Power Systems* (N.D.Cal. 2005) 399 F.Supp.2d 1064, 1076, 1079, the jury found that the plaintiff was entitled to recover for one misappropriated secret when the plaintiff's evidence was based upon the defendant's misappropriation of 11 secrets. Since there was no reasonable basis upon which the jury could have determined what portion of the defendant's enrichment was related to only one secret, unjust enrichment was not provable. (*Id.* at p. 1077.) Because neither unjust enrichment nor damages had been proven, the trial court granted the plaintiff's request for a reasonable royalty. (*Ibid.*)

In both of the foregoing cases, the plaintiff's evidence of its actual loss and the defendant's unjust enrichment was insufficient as a matter of law. Indeed, there are undoubtedly many cases in which a defendant has either not utilized the stolen secret commercially or has not benefitted in any way that can be measured in monetary terms. In those cases, the plaintiff would be unable to present any sufficient evidence to support a monetary award measured by the defendant's unjust enrichment. Likewise, a plaintiff's actual losses may be speculative or nonexistent. In those types of cases, whether the parties stipulate to the lack of proof or a court rules that the evidence is insufficient, the two measures of damages would not be "provable." This is not one of those cases, however, because Ajaxo did have sufficient evidence as demonstrated by our decision in *Ajaxo I* and by the fact that Ajaxo's evidence withstood E*Trade's nonsuit motion in the second trial. But the jury ultimately rejected Ajaxo's evidence and found instead that E*Trade made no profit. Thus, the question is whether unjust enrichment is "provable" within the meaning of section 3426.3, subdivision (b), where the evidence of unjust enrichment is sufficient as a matter of law but the jury rejects it as a matter of fact. Finding some ambiguity in the plain language of the statute, we look to the legislative history.

The CUTSA was derived from the Uniform Act (*Cypress Semiconductor Corp. v. Superior Court, supra*, 163 Cal.App.4th at p. 586, fn. 3) and, like the Uniform Act, was intended to codify the common law (14 West's U. Laws Ann., *supra*, U. Trade Secrets Act, Prefatory Note, p. 531).[7] In 1984, when the CUTSA was enacted (Stats. 1984, ch. 1724, § 1, p. 6252), the common law provided that damages for misappropriation could be measured by the plaintiff's loss, the defendant's unjust enrichment, or by a reasonable royalty set by the trial court. As a general rule, the reasonable royalty measure of damages was "only appropriate where the defendant has made no actual

---

[7] Since the CUTSA is derived from the Uniform Act, it is appropriate to accord substantial weight to the comments of the National Conference of Commissioners on Uniform State Laws where applicable. (*Cypress Semiconductor Corp. v. Superior Court, supra*, 163 Cal.App.4th at p. 586, fn. 3.)

profits and the plaintiff is unable to prove a specific loss." (*Jet Spray Cooler, Inc. v. Crampton* (1979) 377 Mass. 159, 171, fn. 10 [385 N.E.2d 1349], citing, among others, *University Computing, supra*, 504 F.2d at pp. 536–537.) In 1984, however, the Uniform Act did not have any provision allowing for damages measured by a reasonable royalty (14 West's U. Laws Ann., *supra*, U. Trade Secrets Act, § 3, p. 634), which author Roger Milgrim characterized in his initial observations as a "serious oversight." (1 Milgrim on Trade Secrets (2010) Definitional Aspects, §§ 1.01[2], p. 1-27, 1.01[2][a], p. 1-45, fn. 31.)[8] Citing *Jet Spray Cooler*, Milgrim noted that under the common law, "absent provable damages or defendant's profits, [citation], courts typically award 'reasonable royalty . . . .' " (1 Milgrim on Trade Secrets, *supra*, at p. 1-45, fn. 31.) Nothing in the cases or the commentaries on the common law suggests that a defendant's lack of profit be determined as a matter of law, rather than as a matter of disputed fact.

Since the Uniform Act did not contain a reasonable royalty provision at the time the California Legislature drafted the CUTSA, our Legislature had to draft its own version. The history of Assembly Bill No. 501 (1983–1984 Reg. Sess.), by which the CUTSA was enacted, does not elaborate on the issue.[9] The reasonable royalty provision was added in an early amendment, phrased exactly as it is currently. (See, e.g., Assem. Bill No. 501, as amended Apr. 21, 1983.) Other legislative materials shed no light upon the problem before us. (See, e.g., Sen. Republican Caucus, analysis of Assem. Bill No. 501 (1983–1984 Reg. Sess.) Aug. 15, 1984 [stating that reasonable royalties would be available if damages or unjust enrichment "could not be proved"].) Since the CUTSA was intended to codify the common law, it is reasonable to assume that the Legislature intended the reasonable royalty amendment to track the common law practice of allowing for reasonable royalties when the plaintiff could not prove any loss and the defendant "made no actual profits." There is no reason to believe that the Legislature intended the hairsplitting distinction E*Trade urges here.

The public policies underlying trade secret laws convince us that E*Trade's construction is untenable. Trade secret laws in general are designed to promote the sharing of knowledge and to reward innovation. (*Kewanee Oil Co. v. Bicron Corp.* (1974) 416 U.S. 470, 493 [40 L.Ed.2d 315, 94 S.Ct. 1879].) While all persons have the right to engage in businesses and occupations of their choosing, "also fundamental to the preservation of our free market economic system is the concomitant right to have the ingenuity and industry one invests in the success of the business or occupation

---

[8] The Uniform Act corrected the oversight with its 1985 amendments. (14 West's U. Laws Ann., *supra*, U. Trade Secrets Act, § 3, p. 634.)

[9] On our own motion, pursuant to Evidence Code section 459 we have taken judicial notice of the legislative history of Assembly Bill No. 501 (1983–1984 Reg. Sess.).

protected from the gratuitous use of that 'sweat-of-the-brow' by others." (*Morlife, Inc. v. Perry, supra*, 56 Cal.App.4th at p. 1520.) Stated most broadly, the goal of trade secrets law is to maintain important standards of commercial ethics. (*Kewanee Oil Co. v. Bicron Corp., supra*, at p. 481; *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 878 [4 Cal.Rptr.3d 69, 75 P.3d 1].)

It would hardly protect or reward innovation if we were to adopt E*Trade's interpretation of section 3426.3, subdivision (b). In *University Computing, supra*, 504 F.2d 518, a case decided under the common law, the defendant had stolen a computerized inventory system intending to sell the system to its own customers, but had not sold the system to anyone before the foul play was discovered. (*Id.* at pp. 533–534.) In discussing the proper measure of damages, the appellate court noted that where the defendant does not make any profit, reasonable royalties could be awarded. The rationale for this "seems clearly to be that the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves." (*Id.* at p. 536.) This rationale applies whether the defendant's loss is determined as a matter of law or as a matter of disputed fact.

Entirely absent from E*Trade's discussion is the fact that a defendant may achieve any number of nonpecuniary benefits by stealing a trade secret. For example, the stolen secrets might reveal that a particular avenue of inquiry would be unsuccessful, thereby saving the defendant significant research and development efforts. But as E*Trade would have it, even where liability is proved and the defendant has enjoyed some nonpecuniary benefit as a result of the theft, if a plaintiff offers any sufficient evidence to show the defendant was unjustly enriched and the jury rejects the evidence, the trial court would have no discretion to award any monetary relief at all. The defendant would have benefitted by the plaintiff's efforts and ingenuity but the plaintiff could not be compensated. This would be inconsistent with the public policies underlying the law.

E*Trade argues that if unjust enrichment were considered provable in circumstances such as those in this case it would encourage plaintiffs to forego an "eminently provable" measure of damages in order to pursue "windfall" recoveries "because the downside of failure would be no worse than a second chance for reasonable royalties." Underlying the argument is E*Trade's assertion that Ajaxo had modest actual losses and, for its own strategic reasons, elected not to pursue those at trial.[10] E*Trade's argument

---

[10] E*Trade's mention of "windfall" recoveries is an oblique reference to the fact that on retrial Ajaxo pursued an entirely new way to calculate unjust enrichment that inflated its claim several hundred times over that which it sought in the first trial. But given our reversal in the

incorrectly presumes that the measure of damages the plaintiff did not present to the jury somehow drops out of the picture when the plaintiff turns to a request for reasonable royalties. That would be inconsistent with the statute, which allows for reasonable royalties only "[i]f *neither* [actual loss] damages nor unjust enrichment caused by misappropriation are provable." (§ 3426.3, subd. (b), italics added.) Thus, for example, if a plaintiff is unsuccessful in proving unjust enrichment before the jury, the trial court would still have to decide whether the plaintiff suffered any measurable loss of its own before the reasonable royalty remedy would become available. Furthermore, recovery of a royalty is not guaranteed even where actual losses and unjust enrichment are not provable. Section 3426.3, subdivision (b) provides only that the court "may" award reasonable royalties in that situation.

■ We conclude that where a defendant has not realized a profit or other calculable benefit as a result of his or her misappropriation of a trade secret, unjust enrichment is not provable within the meaning of section 3426.3, subdivision (b), whether the lack of benefit is determined as a matter of law or as a matter of fact. To hold otherwise would place the risk of loss on the wronged plaintiff, thereby discouraging innovation and potentially encouraging corporate thievery where anticipated profits might be minimal but other valuable but nonmeasureable benefits could accrue.

### 3. Evidence of a Reasonable Royalty

E*Trade argues that Ajaxo did not introduce sufficient evidence to allow the trial court to determine "what royalty, if any, would be reasonable under the circumstances." (*Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 628 [12 Cal.Rptr.2d 741].) We disagree. Evidence of the negotiations between the parties pertaining to the licensing of Ajaxo's software and evidence of the price E*Trade paid for the license it obtained from Everypath could have served as a starting point for the trial court's estimate of what the parties would have agreed was a fair licensing price at the time the misappropriation occurred. (*University Computing, supra,* 504 F.2d at p. 538.)

---

first case, Ajaxo was not bound to any particular calculation. (*Hall v. Superior Court* (1955) 45 Cal.2d 377, 381 [289 P.2d 431] [unqualified reversal places parties in the same position as if the cause had never been tried].) Our remand in *Ajaxo I* was limited to the issue of damages for misappropriation but was not otherwise qualified. The issue of damages for misappropriation was placed at large for retrial and the parties were free to present any evidence, including new or additional evidence, in support of or against the allegations in the complaint. (Cf. *Weightman v. Hadley* (1956) 138 Cal.App.2d 831, 836 [292 P.2d 909]; *Guzman v. Superior Court* (1993) 19 Cal.App.4th 705, 708 [23 Cal.Rptr.2d 585].)

## 4. Actual Loss

E*Trade maintains that Ajaxo's actual loss was "eminently provable" and that the judgment may be affirmed on that basis. Ajaxo responds that E*Trade is estopped from making the argument. We agree with Ajaxo.

■ In proper circumstances, the doctrine of judicial estoppel prevents a party who has taken one position in litigation from taking an inconsistent position later. (*In re Stier* (2007) 152 Cal.App.4th 63, 80 [61 Cal.Rptr.3d 181].) The doctrine comes into play when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position; (4) the two positions are completely inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 34 [61 Cal.Rptr.3d 145].) The elements of the doctrine are applicable here.

Prior to the second trial, E*Trade moved to exclude evidence of Ajaxo's actual loss. E*Trade argued that there was no evidence to support such a claim and any suggestion that Ajaxo lost customers as a result of the misappropriation was "speculative and without foundation." E*Trade submitted excerpts from the depositions of Ajaxo principals, Sing Koo and Connie Chun. Koo and Chun admitted in their pretrial depositions that they could not quantify Ajaxo's losses resulting from the misappropriation; any potential loss was "purely speculative." Koo could not point to any lost customers other than E*Trade. E*Trade also pointed out that Koo had physically destroyed all of Ajaxo's financial evidence after the first trial by smashing its computer hard drives to pieces. The trial court granted the motion and excluded the evidence. It is true that E*Trade's success in excluding evidence of actual losses was due, at least in part, to Ajaxo's decision not to oppose it. But that does not alter the fact that E*Trade went to some trouble to convince the trial court that Ajaxo had, indeed, suffered no actual loss, producing the testimony of Ajaxo's principals to support the point.

On appeal, E*Trade takes a position that completely conflicts with the position it successfully advanced below. E*Trade now cites as evidence of actual loss the reference in *Ajaxo I* to the expert Ajaxo planned to have testify on the subject of lost profits at the first trial. (*Ajaxo I, supra,* 135 Cal.App.4th at pp. 59–60.) But, as E*Trade now admits, it challenged this evidence as well, attacking the expert's qualifications and the admissibility of his testimony in another motion to exclude the evidence. The trial court did not rule on that motion because Ajaxo withdrew the expert, along with its claim for actual loss damages, before the court ruled. While Ajaxo's decision to forego recovery of actual losses might have been a tactical choice, such tactics are

hardly the nefarious scheming E*Trade makes them out to be. Ajaxo likely took the evidence and E*Trade's vigorous opposition into account in making the election. In short, E*Trade made two successful efforts to exclude evidence of Ajaxo's actual loss damages by showing that the evidence was insufficient as a matter of law. It is, therefore, estopped from arguing otherwise now.

We note, moreover, that E*Trade's current position is undermined by the record. The only evidence E*Trade cites as supporting a claim for actual loss aside from the expert testimony E*Trade challenged prior to the first trial is the evidence of licenses Ajaxo might have sold to E*Trade and others who purchased the wireless product from Everypath. But as E*Trade was careful to establish below, evidence of lost sales to others could not be established with any certainty. As to the one potential sale to E*Trade, the parties never agreed upon a price. Although Ajaxo offered to license its product to E*Trade for $860,000, E*Trade claimed to be looking for a partner in the process and was not inclined to simply buy a license, which is what Ajaxo was offering at the time. Thus, even the supposedly lost sale to E*Trade is not an *actual* loss. Nor do the facts lend themselves to calculation of losses on other typical bases. E*Trade did not publish the secrets and, therefore, did not deprive Ajaxo of the ability to sell its product to others. Ajaxo was not in competition with E*Trade, so E*Trade's profits would not have reflected profits Ajaxo might have earned instead.[11] It follows that we may reject E*Trade's argument on its merits as well as for reasons of fairness.

### 5. Conclusion

We conclude that given the jury's finding that E*Trade did not profit from its misappropriation of trade secrets, unjust enrichment is not "provable" within the meaning of section 3426.3. We further conclude that, since E*Trade had consistently and successfully taken the position that Ajaxo's actual losses are not provable, E*Trade is estopped from arguing otherwise now. Thus, since neither actual loss nor unjust enrichment is provable, the trial court had discretion pursuant to section 3426.3, subdivision (b) to order payment of a reasonable royalty. The matter must be remanded to allow the trial court to exercise its discretion in that regard.

---

[11] Because Ajaxo raised the estoppel issue in its reply brief, we solicited and have received supplemental briefing from E*Trade on the point. In its supplemental brief E*Trade argues that the contract damages awarded in *Ajaxo I* show that Ajaxo suffered a provable actual loss. But in the first trial, "Ajaxo's theory of recovery on the contract was that E*Trade was unjustly enriched because of its breach of the NDA." (*Ajaxo I, supra*, 135 Cal.App.4th at p. 55.) Consequently, the contract award represented the jury's estimate of the amount by which E*Trade had benefitted from its breach of the NDA, not Ajaxo's lost profits resulting from the misappropriation.

---

## *VI. Disposition*

The judgment is reversed. The matter is remanded to the trial court to conduct further proceedings in accordance with the opinions expressed herein.

The parties shall bear their own costs on appeal.

Rushing, P. J., and Duffy, J.; concurred.

Respondent's petition for review by the Supreme Court was denied November 10, 2010, S187156.