# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SORRENTO THERAPEUTICS, INC., a Delaware corporation, and SCILEX PHARMACEUTICALS INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0210-PAF |
| ANTHONY MACK, an individual, and VIRPAX PHARMACEUTICALS, INC., a Delaware corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: November 15, 2024
Date Decided: July 31, 2025

Kevin M. Coen, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jamie L. Wine, Steven N. Feldman, LATHAM & WATKINS LLP, New York, New York; Matthew W. Walch, Russell Mangas, LATHAM & WATKINS LLP, Chicago, Illinois; *Attorneys for Plaintiffs Sorrento Therapeutics, Inc. and Scilex Pharmaceuticals Inc.*

Elizabeth A. Sloan, Brittany M. Giusini, BALLARD SPAHR LLP, Wilmington, Delaware; Paul Lantieri, III, BALLARD SPAHR LLP, Philadelphia, Pennsylvania; *Attorneys for Defendant Virpax Pharmaceuticals, Inc.*

Stephen B. Brauerman, Justin C. Barrett, BAYARD, P.A., Wilmington, Delaware; *Attorneys for Defendant Anthony Mack.*

**FIORAVANTI, Vice Chancellor**

This opinion determines the appropriate remedies resulting from a corporate officer's breaches of fiduciary duty, violation of a restrictive covenants agreement, and misappropriation of trade secrets. In its post-trial opinion adjudicating liability, the court found that the officer's corporate co-defendant aided and abetted his breaches of fiduciary duty, tortiously interfered with the restrictive covenants agreement, and misappropriated the plaintiffs' trade secrets. At the time of trial and in post-trial briefing, the plaintiffs sought a variety of potential remedies against the defendants, including injunctive relief, damages, the imposition of a constructive trust, and a royalty payment based on the profits derived from the co-defendant's products in the event they ultimately became marketable. The court's post-trial opinion requested additional briefing on the appropriate remedy in light of the specific claims for which the defendants were held liable.

In the interim, the plaintiffs reached a settlement with the officer's corporate co-defendant. The settlement created a host of new issues. For example, the officer now claims a right to contribution against his co-defendant, which he neither pleaded nor sought before the settlement. The plaintiffs, now left only with the individual defendant, have reformulated their preferred remedies. This opinion sorts through the morass and concludes that the appropriate remedy involves a mix of injunctive and monetary relief against the remaining defendant. The court also concludes that the officer's conduct warrants partial fee-shifting in favor of the plaintiffs.

# I. BACKGROUND

The background of this action is described in the court's post-trial opinion on liability (the "Liability Opinion").[1] This opinion recites only the facts necessary to determine the proper remedies. Unless otherwise noted, the following summary is drawn from the undisputed facts described in the Liability Opinion, the pleadings, and trial exhibits.[2]

## A. Sorrento Acquires Scilex.

Defendant Anthony Mack co-founded Plaintiff Scilex Pharmaceuticals Inc. ("Scilex") in 2012 and served as its President.[3] In 2013, Scilex licensed a preclinical product that would later become "ZTlido."[4] ZTlido is a pain relief product that delivers lidocaine through a transdermal patch applied to the skin.[5] When ZTlido

---

[1] *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689 (Del. Ch. Sept. 1, 2023) ("*Liability Op.*").

[2] Capitalized terms used herein but not defined have the meanings set forth in the Liability Opinion. Deposition testimony is cited as "(Surname) Dep.," with dates for individuals who have multiple depositions; trial exhibits are cited as "JX"; and references to the docket are cited as "Dkt.," with each followed by the relevant section, page, paragraph, exhibit, or docket number. Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. After being identified initially, individuals are referenced herein by their surnames without regard to honorifics. No disrespect is intended.

[3] *Liability Op.* at *1–2.

[4] *Id.* at *2.

[5] *Id.* at *4.

was eventually approved by the FDA in 2018, it was approved only to treat post-herpetic neuralgia, commonly known as shingles pain.[6]

On November 8, 2016, Plaintiff Sorrento Therapeutics, Inc. ("Sorrento," and together with Scilex, the "Plaintiffs") acquired a 72% stake in Scilex for approximately $50 million.[7] Mack received $12 million for his Scilex equity in the transaction and agreed to stay on as Scilex's President.[8] As President, Mack was charged with identifying potential products for licensing and commercialization.[9] In connection with the Scilex acquisition, Mack signed a Restrictive Covenants Agreement ("RCA") preventing him from having any relationship with any entity engaging in activities "directly or indirectly competitive with" ZTlido for two years.[10] Mack resigned from Scilex effective March 16, 2018.[11]

### B.     Mack Forms Virpax and Breaches the RCA.

On November 1, 2016—one week before the Scilex acquisition closed—Mack formed Virpax Pharmaceuticals, LLC ("Virpax LLC").[12] On May 12, 2017,

---

[6] *See id.*

[7] *Id.* at *2, *5.

[8] *Id.* at *5.

[9] *Id.* at *6.

[10] *Id.* at *5 (quoting JX 185 § 2).

[11] *Id.* at *10.

[12] *Id.* at *6.

3

Mack formed Virpax Pharmaceuticals, Inc. ("Virpax"), the other defendant in this case (collectively, the "Defendants").[13]

Shortly after Sorrento acquired its stake in Scilex, Mack began diverting opportunities intended for Scilex to Virpax and other entities that he owned. On August 24, 2016, the chief operating officer of MedPharm approached Mack and expressed interest in collaborating with Scilex on a diclofenac spray foam product.[14] Mack diverted the opportunity to his affiliated entity, Troy Capital Health, which signed a confidentiality disclosure agreement ("CDA") with MedPharm in October 2016.[15] MedPharm later signed a similar agreement with Virpax LLC.[16] In June 2017, Mack created a target product profile ("TPP") for the diclofenac spray foam product by making alterations to a Scilex draft TPP for a proposed diclofenac patch.[17] On April 11, 2017, Virpax entered into an option agreement to receive an exclusive worldwide license for MedPharm's MedSpray technology, which it later exercised to develop Epoladerm.[18] As of trial, Epoladerm had not yet been approved by the FDA.[19]

---

[13] *Id.*

[14] *Id.*

[15] *Id.* at *7.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

4

Another licensor, LipoCure, was introduced to Scilex in November 2015, before the Scilex acquisition closed.[20] Mack and others at Scilex pursued the licensing of LC400, a liposomal bupivacaine formulation in a stabilizing gel for post-operative analgesia, for Scilex between November 2015 and January 2017.[21] In January 2017, Mack told the principal of LipoCure that Sorrento was not presently willing to commit capital to the project, but Sorrento would "continue to update our business case for LC 400 so we are in the best position to support the development [sic] LC 400 once ZTlido is approved or we receive additional funding."[22] In March 2017, Mack diverted the LipoCure opportunity to Virpax instead.[23] Shortly thereafter, LipoCure and Virpax executed a CDA and term sheet.[24] They then entered into a license agreement for LC400 on March 19, 2018.[25] Virpax is developing LC400 under the trademark "Probudur," which has not yet been approved by the FDA.[26]

---

[20] *Id.*

[21] *Id.* at *7–8.

[22] *Id.* at *8 (quoting JX 530 at 2).

[23] *Id.* at *9.

[24] *Id.*

[25] *Id.*

[26] *Id.* As of trial, Probudur was in preclinical animal testing. *Id.*

In October 2016, shortly before the closing of the Scilex acquisition, Mack met with representatives of Nanomerics about its solution for treating dry eye.[27] Mack excluded Scilex from these discussions.[28] Mack first steered the opportunity to Troy, and later to IACTA Pharmaceuticals Inc., an entity that Mack had founded in 2013.[29] In 2018, Mack and IACTA reengaged with Nanomerics.[30] On March 19, 2018, Virpax and Nanomerics entered into a CDA that enabled IACTA to evaluate NM-0127, a Nanomerics product.[31] On April 11, 2019, Virpax entered into a license agreement with Nanomerics for NM-0127, which is now branded as "Envelta."[32] Envelta is a "nasal spray that delivers encephalin, a non-opioid pharmaceutical product, to delta receptors in the brain in order to provide full body pain relief."[33]

As of trial, Virpax continued to develop Epoladerm, Probudur, and Envelta (the "Pipeline Products"), none of which have been approved by the FDA or are available for sale.[34]

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at *2, *9; JX 135. IACTA never developed the product. *Liability Op.* at *9 n.118.

[30] *Liability Op.* at *9.

[31] *Id.*

[32] *Id.*

[33] *Id.* at *10. As of trial, Envelta was also in preclinical animal testing. *Id.*

[34] *Id.* ("The FDA has not yet approved any of the Pipeline Products. None of the Pipeline Products are currently available for sale.").

## C. The Liability Opinion

The court issued the Liability Opinion in September 2023. The Liability Opinion found that Mack had breached the RCA, and Virpax had tortiously interfered with the RCA by developing Epoladerm.[35] The court also found that Mack had breached his fiduciary duties by taking the development opportunities with MedPharm, LipoCure, and Nanomerics and by using Scilex employees, funds, and data to develop these pathways at Virpax.[36] The court concluded that Virpax had aided and abetted these breaches of fiduciary duty.[37]

Plaintiffs, however, obtained a much more modest victory on their claims for misappropriation of trade secrets. Plaintiffs asserted that more than 1,000 documents, which they listed on an Excel spreadsheet, were each a trade secret and together represented the cumulative efforts of Scilex's research and development ("R&D").[38] The court concluded in the Liability Opinion that Plaintiffs had met their burden to prove that only five out of the thousand-plus proffered documents contained trade secret information and the Defendants had misappropriated them.[39]

---

[35] *Id.* at *12–23.

[36] *Id.* at *23–28.

[37] *Id.* at *28–29.

[38] *Id.* at *29, *31.

[39] *Id.* at *32–33. The five documents with trade secret information are as follows: (1) a R&D guidance document for a 505(b)(2) submission to the FDA; (2) a document

The Liability Opinion did not address remedies. Rather, the court determined that further proceedings would be helpful to formulate an appropriate remedy.[40] Thereafter, the parties submitted supplemental briefing on the issue of remedies.[41] Before the court issued a decision on remedies, Plaintiffs entered into a Settlement Agreement and Mutual Releases with Virpax on February 29, 2024 (the "Settlement Agreement").[42] The Settlement Agreement provides a release of all claims against Virpax in exchange for: (1) $6.0 million in cash; (2) a six percent (6%) royalty on the net sales of the Pipeline Products during a specified term; and (3) Virpax's destruction of all of Plaintiffs' non-public information in their possession.[43] The Settlement Agreement expressly states that Mack "is not included in th[e] release" and Plaintiffs "reserve the ability to pursue all [c]laims against [] Mack."[44]

---

describing the regulatory pathway for a lidocaine patch; (3) a part of ZTlido's IND application containing information regarding biopharmaceutical studies on ZTlido; (4) raw data and charts regarding segmentation of the lidocaine market; and (5) the TPP for a diclofenac patch. *See id.* (citing JX 22; JX 29; JX 66; JX 122; JX 203).

[40] *Liability Op.* at *34.

[41] Dkts. 242 ("Pls.' Remedies Opening Br."), 245 ("Defs.' Remedies Answering Br."), 250 ("Pls.' Remedies Reply Br.").

[42] Dkt. 258 Ex. A ("Settlement Agreement").

[43] *Id.* §§ 2–4.

[44] *Id.* § 6. Mack claims to have been blindsided by the Settlement Agreement. *See* Dkt. 263 at 1. Mack claims that Virpax assured him that it was negotiating a global settlement that included a resolution of the claims against him. *Id.* at 1–2, 9–10. That disagreement is not directly before the court at this stage, and this opinion does not address it further.

After the parties informed the court of the Settlement Agreement, the court requested additional briefing regarding the effect of the Settlement Agreement on potential remedies.[45]   Following the additional briefing,[46] the court held oral argument and took the matter under advisement.[47]

## II.   ANALYSIS

It is this court's responsibility to "put in place a balanced remedy that is equitable and reasonably tailored to address the precise nature of the misconduct at issue." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at \*24 (Del. Ch. Feb. 18, 2010).  This court is enabled "to shape remedies that bear a reasonable relationship to the breach and the factual record, and that impose the burden of uncertainties on the wrongdoers." *Id.* (footnote omitted).  Indeed, "[i]n determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief[.]" *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859–60 (Del. Ch. 2022) (quoting *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000)).

---

[45] Dkt. 254.  Plaintiffs and Virpax subsequently filed a joint motion to dismiss the claims against Virpax in light of the Settlement Agreement, which Mack opposes.  *See* Dkts. 257, 263.

[46] Dkts. 258 ("Pls.' Suppl. Remedies Opening Br."), 264 ("Mack's Suppl. Remedies Answering Br."), 269 ("Pls.' Suppl. Remedies Reply Br.").

[47] Dkt. 275.

Relying upon the broad equitable powers of this court to fashion appropriate relief, the court has carefully considered the conduct of the parties, the record, and the real-world circumstances that are presented at this stage of the proceedings. The remedies described in this opinion attempt to compensate Plaintiffs for the effects of Mack's contractual, fiduciary, and statutory breaches on Plaintiffs' nascent-stage development of the Pipeline Products. Getting there is an inherently imprecise process and is compounded by the Settlement Agreement and by Plaintiffs' subsequent recasting of their requested relief against Mack. The following summary of the developments in this case from trial to the present provides the context for the court's determination of appropriate relief.

## A. The Remedies Requested by Plaintiffs at Trial and in Post-Trial Briefing

Plaintiffs were successful, at least in part, on three groups of claims against Mack. First was Mack's breach of the non-compete provision of the RCA. Second was Mack's breach of the duty of loyalty for usurping corporate opportunities and misappropriating corporate assets. Third was Mack's misappropriation of Scilex trade secrets in violation of the California Uniform Trade Secrets Act (the "CUTSA"). Mack's liability on those three groups of claims served as the predicate for Virpax's liability for tortious interference with the RCA, aiding and abetting Mack's breaches of fiduciary duty, and for its own misappropriation of Scilex trade secrets.

10

At trial and in post-trial briefing, Plaintiffs sought complementary and overlapping relief against both Mack and Virpax for each of the three groups of claims. For Mack's breach of the RCA, Plaintiffs sought injunctive relief by way of extending the term of Mack's non-competition obligation for a term of two years from the date of a final order.[48] Plaintiffs also sought to enjoin Virpax from developing or marketing the Pipeline Products for two years based on its tortious interference with the RCA.[49] Alternatively, if injunctive relief was not appropriate, Plaintiffs sought damages against both Mack and Virpax.[50] Plaintiffs' damages theory was based upon an analysis of the lost profits from Scilex's ZTlido sales due to Virpax's projected sales of Epoladerm.[51]

For Mack's breaches of fiduciary duty and Virpax's aiding and abetting that breach, Plaintiffs sought imposition of a constructive trust on the revenues from the Pipeline Products.[52] Alternatively, Plaintiffs requested a running royalty on the revenues from the Pipeline Products.[53] Plaintiffs chose these remedies because they

---

[48] Dkt. 215 ("Pls.' Post-Trial Opening Br.") at 46–48.

[49] *Id.* at 48.

[50] *Id.* at 49 ("*If* the Court does not enter an injunction requiring Defendants to honor the RCA for the full period, Scilex is entitled to compensatory damages for its lost profits stemming from Mack's breaches." (emphasis added)).

[51] *Id.* at 49–52.

[52] *Id.* at 52–53.

[53] *Id.* at 53–54.

recognized that damages would be difficult to prove given the uncertainty that any of the drug candidates would achieve commercial success.[54]  Plaintiffs also sought damages from both defendants for Mack's use of Scilex personnel to perform work for Virpax.[55]  As to the latter, Plaintiffs requested an amount of damages derived from the total annual salaries of each Scilex employee who performed work for Mack or Virpax, including Mack, and certain travel expenses diverted by Mack.[56]

For Defendants' misappropriation of trade secrets, Plaintiffs presented three alternative damages theories.  First, Plaintiffs sought unjust enrichment damages in an amount equal to Scilex's entire R&D expenditures over a five-year period from 2012 to 2017.[57]  Second, Plaintiffs sought damages based upon their potential lost profits from ZTlido attributable to Virpax's potential future sales of the not-yet commercialized Epoladerm.[58]  Plaintiffs abandoned the lost profits theory in post-trial briefing.[59]  Third, Plaintiffs sought a reasonable royalty in an amount derived

---

[54] *See id.* at 53 ("[G]iven the uncertainty in the likelihood of commercial success of at least some of these products, a constructive trust that would allow Scilex to share in the commercial success of the products if and when they are sold would be the most efficient economic remedy.").

[55] *Id.* at 54–56.

[56] *Id.* at 55.

[57] Dkt. 192 ("Pls.' Pretrial Br.") at 54–55; Pls.' Post-Trial Opening Br. 56–58.

[58] Pls.' Pretrial Br. 55–56.

[59] *Compare id.* at 54–58 (seeking lost profit damages, unjust enrichment damages, and reasonable royalty in pretrial briefing), *with* Pls.' Post-Trial Opening Br. 56–60 (seeking

from a hypothetical negotiation between Scilex and Virpax for the misappropriated trade secrets.[60] Plaintiffs also sought an order enjoining Defendants from further use of the alleged trade secrets.[61]

Finally, Plaintiffs sought to shift fees based on Mack's "egregious breach of the duty of loyalty and the Defendants' willful and malicious [mis]appropriation of Scilex's trade secrets," as well as exemplary damages under the CUTSA.[62]

## B. Following the Settlement Agreement, Plaintiffs Pivot on Their Preferred Remedies.

The Liability Opinion requested additional briefing on remedies. At that stage, Mack and Virpax, as co-defendants, were aligned in their opposition to Plaintiffs' requested relief and filed a joint supplemental brief.[63] Shortly thereafter, Plaintiffs and Virpax entered into the Settlement Agreement. The Settlement Agreement not only created a wedge between Mack and Virpax but also caused the Plaintiffs to reprioritize their preferred remedies. Because Virpax agreed to pay a

---

unjust enrichment damages and reasonable royalty in post-trial briefing); *see Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial."); *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *16 & n.190 (Del. Ch. May 10, 2018) (treating claims not briefed as abandoned).

[60] Pls.' Pretrial Br. 56–58; Pls.' Post-Trial Opening Br. 58–60.

[61] Pls.' Pretrial Br. 59; Pls.' Post-Trial Opening Br. 61–62.

[62] Pls.' Post-Trial Opening Br. 60–61.

[63] *See* Dkt. 245.

13

6% running royalty on the Pipeline Products as part of the Settlement Agreement, Plaintiffs no longer ask the court to enjoin Mack or Virpax from developing the Pipeline Products.[64] Instead, Plaintiffs' preferred remedy is an award of more than $14 million in lost profit damages directly from Mack for his breach of the RCA.[65]

For Mack's breaches of fiduciary duty, Plaintiffs' preferred remedy is now unjust enrichment damages in the amount paid by Scilex for the employee salaries and the travel expenses improperly diverted by Mack.[66] Plaintiffs are no longer seeking the imposition of a constructive trust on the profits from the Pipeline Products or a running royalty.[67]

For Mack's misappropriation of trade secrets, Plaintiffs' preferred remedy is now a reasonable royalty of no less than $6.7 million and an injunction.[68] Plaintiffs

---

[64] Pls.' Suppl. Remedies Opening Br. 2–3, 5; Pls.' Suppl. Remedies Reply Br. 1.

[65] Pls.' Suppl. Remedies Opening Br. 5; Pls.' Suppl. Remedies Reply Br. 4. The parties did not attempt to place a dollar value on the 6% running royalty. *See* Pls.' Suppl. Remedies Opening Br. 1, 5, 7 (referring to 6% royalty generally but not including a monetary valuation).

[66] Pls.' Suppl. Remedies Opening Br. 6–9; Pls.' Suppl. Remedies Reply Br. 6–7.

[67] *Compare* Pls.' Post-Trial Opening Br. 52–56 (seeking imposition of a constructive trust, a running royalty, and unjust enrichment damages), *with* Pls.' Suppl. Remedies Opening Br. 7 & n.6 (explaining Plaintiffs "have elected not to pursue" a constructive trust or running royalty and "are instead focusing on the money damages due from [] Mack" for his breaches of fiduciary duty).

[68] Pls.' Suppl. Remedies Opening Br. 9–11.

no longer seek unjust enrichment damages.[69]  Plaintiffs also request an award of exemplary damages under the CUTSA and their reasonable attorneys' fees and costs.[70]

## C.    The Appropriate Remedies

Having set the stage, the court turns now to its analysis of the appropriate remedies for Mack's contractual, fiduciary, and statutory breaches.  Plaintiffs seek both permanent injunctive relief and damages.

To obtain a permanent injunction, Plaintiffs must demonstrate (1) actual success on the merits, (2) the inadequacy of remedies at law, and that (3) a balancing of the equities weighs in favor of issuing an injunction.  *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1232–33 (Del. Ch. 2022), *aff'd*, 326 A.3d 626 (Del. 2024).[71]  "Further, to gain specific performance of a covenant

---

[69] *Compare* Pls.' Post-Trial Opening Br. 56–62 (seeking unjust enrichment damages, a reasonable royalty, and an injunction), *with* Pls.' Remedies Opening Br. 20–24 (seeking a reasonable royalty and an injunction), *and* Pls.' Suppl. Remedies Opening Br. 9–11 (same).

[70] *Compare* Pls.' Post-Trial Opening Br. 60–61 (seeking exemplary damages and fee shifting), *with* Pls.' Suppl. Remedies Opening Br. 11–12 (same).

[71] Likewise, under California law, a permanent injunction "is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate.  A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate." *Syngenta Crop Prot., Inc. v. Helliker*, 42 Cal. Rptr. 3d 191, 213 (Cal. Ct. App. 2006) (internal quotation marks omitted); *see* Cal. Civ. Code § 3422 ("[A] final injunction may be granted to prevent the breach of an obligation existing in favor of the applicant . . . [w]here pecuniary compensation would not afford adequate relief; [or] [w]here it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief[.]").

not to compete, these elements must be established by clear and convincing evidence." *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at \*14 (Del. Ch. Jan. 17, 2007); *see Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at \*22 (Del. Ch. Oct. 30, 2015) ("To show that [Plaintiffs] [are] entitled to specific performance of a covenant not to compete, [they] must prove the same elements by clear and convincing evidence.").

For an award of monetary relief, it is Plaintiffs' burden to prove damages by a preponderance of the evidence. *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at \*22 (Del. Ch. Jan. 29, 2010). "While a plaintiff must prove the fact of damages by a preponderance of the evidence, the proof required to establish the amount of damage is not as great as that required to establish the fact of damage." *AbbVie Endocrine Inc. v. Takeda Pharm. Co. Ltd.*, 2023 WL 5704055, at \*3 (Del. Ch. Sept. 5, 2023) (emphasis and internal quotation marks omitted). "Nevertheless, when acting as the fact finder, this Court may not set damages based on mere speculation or conjecture where a plaintiff fails to adequately prove damages." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (internal quotation marks omitted), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

### 1. The remedy for Mack's breach of the RCA

#### a. Injunctive relief

The Liability Opinion found that Mack had engaged in activity competitive with ZTlido in breach of the RCA. The underlying facts of Mack's competitive conduct were generally undisputed, and the court found that Mack's conduct violated the terms of the non-competition provision of the RCA. Plaintiffs established actual success on the merits by clear and convincing evidence. This satisfies the first element of the test for entry of a permanent injunction.

As to the second element, the parties agreed in the RCA that any breach of the RCA would cause irreparable harm.[72] A "showing [of] irreparable harm is one way of demonstrating that other remedies are inadequate." *In re COVID-Related Restrictions*, 285 A.3d at 1228. Furthermore, Mack's continued involvement in developing Epoladerm caused, and will continue to cause, irreparable harm unless it is remedied by injunctive relief.

As to the third element, the balance of the equities here weighs in favor of Plaintiffs. Mack took affirmative steps to divert and develop Epoladerm, a competitive product to ZTlido. He did so while concealing these activities from

---

[72] JX 185 § 3(a) ("[Mack] acknowledges and agrees that [he] is familiar with Scilex's trade secrets and other confidential information, and that the Company would be irreparably damaged if [Mack] were to provide services to a Competing Business and that such competition by [Mack] would result in a significant loss of goodwill by the Company.").

Scilex and Sorrento. Mack's activities frustrated Plaintiffs' ability to receive the benefit of their bargain under the RCA. Accordingly, Plaintiffs have established their entitlement to an injunction by clear and convincing evidence. *See Concord Steel, Inc. v. Wilm. Steel Processing Co., Inc.*, 2009 WL 3161643, at *15 (Del. Ch. Sept. 30, 2009) ("[The plaintiff] has established by clear and convincing evidence its right to permanent injunctive relief consisting of the enforcement of the Non-Competition covenant."), *aff'd*, 7 A.3d 486 (Del. 2010) (TABLE).

Under the RCA, the two-year Restrictive Period is tolled until any breach is resolved.[73] Accordingly, Mack will be enjoined from undertaking any activity, direct or indirect, that advances the development of Epoladerm for 18 months and 27 days from the date of this opinion. *See id.* at *15 (granting injunctive relief as a remedy for breach of non-competition restrictive covenant); *Vacco Indus. Inc. v. Van Deng Berg*, 6 Cal. Rptr. 2d 602, 614 (Cal. Ct. App. 1992) (affirming the trial court's issuance of an injunction as a remedy for breach of a non-competition agreement); *see also inTEAM Assocs., LLC v. Heartland Payment Sys., LLC*, 200 A.3d 754 (Del.

---

[73] *Id.* § 3(d) ("In the event of any breach or violation by [Mack] of any of the Restrictive Covenants, the time period off such covenant with respect to [Mack] shall be tolled until such breach or violation is resolved."); *see Liability Op.* at *19 ("[B]y signing the option agreement with MedPharm on April 11, 2017, and exercising that option agreement on behalf of Virpax on June 6, 2017 to license Epoladerm, Mack breached the RCA. His continuing to engage in the development of Epoladerm thereafter with Virpax is a further breach of the RCA. Because the RCA tolls the Restrictive Period until any breach is resolved, the Restrictive Period extends for 18 months and 27 days from the final adjudication of this action.").

18

2018) (TABLE) (noting that the court could extend an injunction beyond its expiration date to account for the enjoined party's breach).[74]

### b. Monetary relief

Plaintiffs also seek damages resulting from Mack's breach of the RCA. Plaintiffs base their request for damages on a theory of lost profits, forecasting their potential loss of sales of ZTlido if Epoladerm is to be commercialized. The court declines to award monetary relief.

A plaintiff can only recover damages if it establishes those damages with reasonable certainty. *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at \*11 (Del. Ch. Nov. 23, 2010).[75] "No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative." *Callahan v. Rafail*, 2001 WL 283012, at \*1 (Del. Super. Mar. 16,

---

[74] The court recognizes that this opinion will not close the book on this case because the amount of reasonable attorneys' fees will need to be decided. Nevertheless, this opinion definitively resolves the issues of breach, along with an appropriate remedy, thus ending the tolling period under the RCA.

[75] The same standard applies under California law. *See Sargon Enters., Inc. v. Univ. of S. Cal.*, 288 P.3d 1237, 1253 (Cal. 2012) ("[T]he general principle [is] that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent." (alterations in original) (internal quotation marks omitted)); *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793, 808 (Cal. Ct. App. 1996) ("A plaintiff seeking to recover for a future loss must show with reasonable certainty that the loss actually would have accrued. Damages which are remote, contingent, or merely possible cannot serve as a legal basis for recovery." (citations and internal quotation marks omitted)); Cal. Civ. Code § 3301 ("No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin.").

2001) (internal quotation marks omitted). Proving money damages for an unproven technology is a "nearly impossible task." *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2004 WL 1192602, at *5 (Del. Ch. May 28, 2004).

Mack argues that lost profits are too speculative to support an award of damages in this case because it is unclear whether Epoladerm will ever reach commercialization.[76] Plaintiffs concede that a monetary award of lost profits is difficult to quantify.[77] In fact, as explained above, Plaintiffs' preferred remedy at trial and in post-trial briefing for Mack's breach of the RCA was an injunction. Plaintiffs alternatively sought lost profits "[*i*]*f the Court does not enter an injunction requiring Defendants to honor the RCA for the full period*[.]"[78] Only after the

---

[76] *See* Dkt. 220 at 3, 63–69 (arguing in post-trial briefing that Plaintiffs' lost profit damages are too speculative); Dkt. 233 at 132:8–16 ("Post-Trial Arg. Tr.") (same, at post-trial argument); Defs.' Remedies Answering Br. 3–4, 12–16 (same, in post-trial supplemental briefing on remedies); Mack's Suppl. Remedies Answering Br. 8–9 (arguing in post-settlement briefing that "Lakdawalla's analysis is based on rampant speculation" and "[i]n the face of such insurmountable speculation, the Court should not award lost-profits damages").

[77] *See* Pls.' Post-Trial Opening Br. 47 (arguing Mack's breach of the RCA caused irreparable harm and damages would be difficult to quantify under the circumstances).

[78] Pls.' Post-Trial Opening Br. 49 (emphasis added); *see also* Post-Trial Arg. Tr. 47:9–15 ("The appropriate remedy, therefore, is that [] Mack and Virpax be enjoined for two years from any further development of Epoladerm, Probudur, and Envelta. Now, in the alternative, if, for some reason, the Court does not grant an injunction, it should award Plaintiff[s] damages."); *id.* at 66:17–22 ("[Q.] You're not seeking that type of injunction along with damages; these are alternative remedies? [A.] For the breach . . . of the RCA, they're alternative remedies, correct."); Pls.' Remedies Opening Br. 2, 7 (arguing injunctive and monetary relief are alternative remedies for Mack's breach of the RCA).

Settlement Agreement did Plaintiffs shift their position and request an award of only lost profit damages.

Ultimately, Plaintiffs fail to fit this case in the sliver between near impossibility and reasonable certainty. Plaintiffs' own expert, Darius Lakdawalla, acknowledges that Epoladerm is not yet approved by the FDA.[79] Rather, Epoladerm remains in the early stages of the 505(b)(2) process. Lakdawalla attempts to control for this uncertainty basing his opinion on Virpax's sales forecasts and their projected commercialization date of January 2025.[80] But this does not cure the uncertainty inherent in both Virpax's sales forecasts and Lakdawalla's expert opinion.

As the Delaware Supreme Court has remarked, when a contract is breached, the court can award expectation damages that are based on an estimate, "as long as the plaintiff can prove the *fact* of damages with reasonable certainty." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015). In that case, the defendant was "on the cusp of bringing [its product] to market" and had a "likely near-term purchaser." *Id.* at 1137–38. The confidence exhibited in *SIGA* is not present here. As of trial, Epoladerm was still preclinical. It has received no vote of

---

[79] JX 638 ¶ 47 ("As of the date of this report, Epoladerm is not yet approved, and therefore there is uncertainty as to both the likelihood of FDA approval and, if approved, the volume of prescriptions that would be sold.").

[80] *Id.* ¶¶ 47–49.

confidence from a government agency like the product in *SIGA*. If Epoladerm does not make it to market, there will be no damages in the form of lost profits at all.

Lakdawalla's opinion on the likelihood of Epoladerm reaching the market relies solely on a statement from Mack that commercialization of Epoladerm is 50% likely.[81] Lakdawalla did no investigation or analysis into Epoladerm's prospects or that of a preclinical product following a 505(b)(2) process.[82] Plaintiffs argue that Mack should be held to his representation and that it forms a sufficient foundation for calculating damages based upon Scilex's projected lost profits from Epoladerm.[83] The court disagrees. As found in the Liability Opinion, Mack was not a credible

---

[81] *Id.* ¶ 47 n.114 ("Since the At-Issue Products are not yet approved by the FDA, I rely on the testimony of Mack regarding the current expectations concerning FDA approval[.]"); *id.* ¶ 54 ("Mack testified in this matter that he expects a 50% likelihood of FDA approval for Epoladerm. Accordingly, I multiply my estimates of Scilex's post-approval lost sales by 50% to estimate expected sales lost."); Tr. 788:14–17 (Lakdawalla) ("I used the probability of Epoladerm launching, and here I relied on [] Mack's testimony, that there was a 50 percent chance of Epoladerm reaching market.").

[82] Lakdawalla Dep. at 81:17–23 ("[Q.] And what analysis did you do to calculate the 50 percent probability? [A.] I'm using [] Mack's estimate of the probability of Epoladerm's launch at 50 percent. [Q.] Anything else? [A.] Not that I recall. I'm using [] Mack's estimate of that approval -- of launch probability."); Tr. 826:17–22 (Lakdawalla) ("Q. Your analysis assumes a 50 percent likelihood of approval for Epoladerm. Right? A. Correct. Q. You obtained this number from [] Mack's deposition testimony? A. Correct."); *id.* at 828–29 (Lakdawalla testifying he only relies on Mack's deposition testimony regarding the likelihood of commercialization of Epoladerm).

[83] *See* Dkt. 225 at 9, 32–33 (arguing Mack has "the most familiarity with [the] products" and has "more than 30 years of experience" in the pharmaceutical industry, and Defendants' criticism of his testimony should be rejected).

witness.[84] It would be inconsistent to now find him credible on the likelihood of Epoladerm's commercialization without other evidence to support it.

The court concludes that Plaintiffs' damages theory based on lost profits is inherently speculative and cannot be proven with reasonable certainty. Accordingly, the court declines to award lost profit damages. The appropriate remedy for Mack's breach of the RCA is enforcement of the non-competition restrictions under the terms of the contract. This is the remedy that Plaintiffs originally sought because they recognized the speculative nature of money damages. The passage of time has not rendered Plaintiffs' damages theory any less speculative today than it was at trial.

### 2. The remedy for Mack's breach of fiduciary duty

The Liability Opinion found that Mack breached his fiduciary duty of loyalty by usurping corporate opportunities and misappropriating Scilex resources. Following the Settlement Agreement, Plaintiffs seek an award of damages against

---

[84] *See Liability Op.* at *8 n.104 ("[Mack] testified that he did speak to Pedranti, but then backpedaled when confronted with his deposition testimony, in which he was uncertain of whether he spoke to Pedranti on the subject."); *id.* at *10 ("Mack could not explain why his emails or the USB's contents had been deleted."); *id.* at *25 ("Mack had no discussion with Ji or any Scilex board member indicating that Scilex was not financially capable of pursuing the right opportunity if it came along. I find Mack's testimony to be not credible on this issue, particularly given his sustained efforts to create Virpax, a competitor to Scilex, at the same time he was President of Scilex and his extensive efforts to conceal his competitive activities from Scilex and Sorrento." (footnote omitted)); *id.* at *26 ("It strains credulity to suggest that Scilex and Sorrento lacked resources to pursue other opportunities when Mack was specifically tasked with doing so. Mack's self-serving testimony to the contrary is not credible[.]").

Mack for his misappropriation of Scilex resources. Plaintiffs no longer seek the imposition of a constructive trust or a running royalty on future revenues of the Pipeline Products.

Lakdawalla estimates damages in the amount of $1,363,045.[85] This figure amounts to the total salaries of Mack ($525,037) and five other Scilex employees ($822,470) between November 2016 and March 2018, and $15,549 of improper expense reimbursements to Mack.[86] Mack argues that this calculation is unreliable because Plaintiffs fail to apportion the time that these employees spent conducting Virpax business, which they argue was *de minimis*.[87]

The court concludes that an award of the entire salaries of the five Scilex employees over nearly a 17-month period is not appropriate here. Plaintiffs' witnesses were unable to discern how much of these employees' time was diverted to Virpax's business.[88] Plaintiffs propose no alternative measure of damages to

---

[85] JX 638 ¶¶ 77, 114; *id.* at 101 (Ex. 4); Tr. 797:11–14, 798:17–19 (Lakdawalla).

[86] JX 638 at 101 (Ex. 4). An attentive reader will notice the total estimated damages adds up to $1,363,*046*, not $1,363,045. This discrepancy, likely due to rounding, is not material to the court's analysis.

[87] *See* Defs.' Remedies Answering Br. 27 ("[A]ny harm from Virpax's acceptance of voluntary assistance from certain Scilex employees and the use of time on a pre-planned trip for Scilex purposes to attend to other business matters is *de minimis*, and no damages are appropriate."); *see also* Mack's Suppl. Remedies Answering Br. 10 ("Simply put, there is no evidence to support an award of 100% of the salaries of Mack and the employees utilized by Mack, or to award Plaintiffs 100% of the cost of business trips where material and significant business for Plaintiffs was performed by Mack.").

[88] *See* Tr. 136:11–139:12 (Ji).

compensate this injury. As such, Plaintiffs have failed to prove damages as to Mack's use of Scilex employees for his or Virpax's business.

Plaintiffs' request to award damages in the amount of Mack's compensation from the closing of the Scilex acquisition to Mack's resignation as President in March 2018 leads to a different result. Mack breached his duty of loyalty by usurping corporate opportunities and Scilex resources for his personal benefit.[89] "[A] fiduciary [may] not profit personally from his [disloyal] conduct." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). When a fiduciary has breached the duty of loyalty, the fiduciary must be deprived of all profit flowing from the breach. *See Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) ("If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit

---

[89] *See Liability Op.* at *23–28 (concluding Mack breached his fiduciary duty of loyalty by usurping from Scilex the opportunity to develop the Pipeline Products).

25

flowing from a breach of the confidence imposed by the fiduciary relation."); *accord*

*Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).

This court has broad equitable power in fashioning a remedy "for fiduciary breaches based upon the circumstances of each case." *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *53 n.268 (Del. Ch. May 31, 2000) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983)). Mack cannot retain the benefits he received as a result of his breaches of fiduciary duty. Mack's disloyal conduct spanned the entire time that he served as Scilex's President following the Scilex acquisition, if not before.[90] Therefore, the court concludes that Mack must repay Scilex an amount equal to his salary for the period from November 1, 2016 to March 16, 2018 ($525,027).

Plaintiffs also proved that Mack sought and obtained $15,549 from Scilex for travel in which he solicited opportunities for his other business entities to the

---

[90] *See id.* at *26 ("[Mack] reached out to LipoCure in March 2017 and shifted the opportunity to his own company, Virpax."); *id.* at *27 ("The sequence of events with MedPharm is even more clear. Muddle contacted Mack, Pedranti, and Vought in 2016 to express interest in a potential collaboration between Scilex and MedPharm. Upon learning about MedPharm's product, Mack diverted the opportunity, first to Troy and later to Virpax."); *id.* ("Each of these opportunities, once taken by Mack, created a conflict between Mack and Scilex. He deliberately hid each of these opportunities from Scilex and Sorrento, choosing instead to pursue them in secret."); *id.* at *28 ("Mack breached his fiduciary duty of loyalty by usurping from Scilex the opportunity to develop Probudur, Envelta, and Epoladerm."). The Liability Opinion indicated that Mack resigned as CEO of Scilex effective March 16, 2018. *Id.* at *10. That statement was inaccurate. Mack resigned as President of Scilex. *See* JX 302 at 2. At that time, he did not hold the position of CEO.

exclusion of Scilex. This was a product of his breach of loyalty for which he was unjustly enriched.[91] Accordingly, the court awards damages in the amount of $540,576.

### 3. The remedy for Mack's misappropriation of trade secrets

The Liability Opinion found that Mack had misappropriated Scilex trade secrets, but not nearly on the scale that Plaintiffs had alleged. In the run-up to trial, Plaintiffs claimed that Mack and Virpax had misappropriated thousands of documents containing Scilex trade secrets.[92] These alleged trade secrets were housed on several devices and platforms, including a USB device containing documents that Mack had downloaded or retained while working at Scilex.[93] At trial, Plaintiffs narrowed the list to approximately 1,000 documents and grouped them into 11 categories.[94] Despite having narrowed the scope of their

---

[91] *See Liability Op.* at *28 (finding Mack "took advantage of [his superior] position and the knowledge and capabilities of Scilex's employees to benefit Virpax without independently compensating them" and "took advantage of Scilex's payment for the trip to meet with Nanomerics while explicitly excluding Scilex from that meeting").

[92] *See* Dkt. 138 ¶ 6 (alleging that Mack "improperly downloaded troves of confidential and proprietary Scilex materials and information—over 3,000 files and documents—to a variety of his personal devices, including a laptop and USB drive"); *id.* ¶ 71 (same); *see also* Pls.' Pretrial Br. 24 (arguing in pretrial briefing that Mack "took several thousand Scilex trade secrets on a Toshiba laptop, a USB device, a personal Dropbox folder, a Virpax Microsoft OneDrive account, a Virpax computer, and a Virpax SharePoint site" and Mack "used a number of these documents in his work for Virpax while he was employed by Scilex" (citations omitted)).

[93] Dkt. 138 ¶¶ 6, 71; Pls.' Pretrial Br. 24, 28.

[94] *See Liability Op.* at *29, *32 & n.254; *see* JX 571A; JX 786.

misappropriation claim, Plaintiffs still overreached. For example, as noted in the Liability Opinion, Plaintiffs were claiming that documents such as Scilex's bylaws, a letter to investors, and a document posted on the Scilex website contained trade secrets.[95] Other purported trade secret information was obviously stale.[96] Plaintiffs also failed to establish that this agglomeration of documents collectively constituted a compilation trade secret.[97] The court, however, did find that Plaintiffs had proved that five documents Mack had downloaded contained Scilex trade secret information, and both Mack and Virpax had misappropriated those trade secrets in violation of the CUTSA.[98] Plaintiffs seek an injunction, a reasonable royalty, and exemplary damages as a remedy for Mack's misappropriation of these trade secrets.

### a. Injunctive relief

"California's trade secret law provides a trade secret owner with several remedies against a misappropriator, including injunctive relief." *DVD Copy Control Ass'n, Inc. v. Bunner*, 75 P.3d 1, 9 (Cal. 2003); *see also LBF Travel Mgmt. Corp. v. DeRosa*, 2025 WL 1088200, at *5 (S.D. Cal. Apr. 11, 2025) ("[The] CUTSA allow[s] injunctive relief as a remedy."). Under the CUTSA, the court may enjoin

---

[95] *See Liability Op.* at *32.

[96] *Id.* at *32 & n.255.

[97] *Id.* at *32.

[98] *Id.* at *32–33. Plaintiffs argued that the misappropriation claim was governed by the CUTSA. The court agreed. *See id.* at *29–30.

28

the use of trade secrets only until "the trade secret has ceased to exist," but may continue the injunction "for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Cal. Civ. Code § 3426.2(a); *see Vacco*, 6 Cal. Rptr. 2d at 614 (affirming trial court's issuance of an injunction as a remedy for trade secret misappropriation under the CUTSA). Injunctive relief will continue "as long as is necessary to preserve the rights of parties," which is "only as long as is necessary to eliminate the commercial advantage that a person would obtain through misappropriation." *Am. Paper & Packaging Prods., Inc. v. Kirgan*, 228 Cal. Rptr. 713, 718 (Cal. Ct. App. 1986); *accord Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 284–85 (Cal. Ct. App. 2002).

Mack does not seriously challenge Plaintiffs' request for an injunction preventing Mack from using or disclosing any of the trade secret information that he misappropriated.[99] The court concludes Plaintiffs have established a sufficient basis for a permanent injunction.[100] Of course, the injunction will terminate once the

---

[99] *See* Defs.' Remedies Answering Br. 41 ("Limited Injunctive Relief Would Be [A]n Appropriate Remedy for Trade Secret Misappropriation"). Mack's later argument that the injunction sought would be impermissibly vague is unpersuasive. *See* Mack's Suppl. Remedies Answering Br. 13. The parties should meet and confer on a form of final implementing order.

[100] The Settlement Agreement permits Virpax to continue to develop the Pipeline Products, but also requires Virpax to destroy all of Scilex's confidential information in its possession.

identified trade secrets are no longer worthy of trade secret protection. *See Am. Paper*, 228 Cal. Rptr. at 718 ("[A]n injunction should terminate when what once might have been a trade secret becomes known to good faith competitors."). In addition, Mack must promptly destroy any of the documents in his possession that contain the trade secret information identified in the Liability Opinion.

### b. Monetary relief

Under the CUTSA, a plaintiff may be awarded monetary relief measured by "the actual loss caused by misappropriation" and "the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." Cal. Civ. Code § 3426.3(a). "If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited." *Id.* § 3426.3(b).

At trial, Lakdawalla proffered opinions on an appropriate award under all three theories. Lakdawalla presented the following ranges under each theory:[101]

---

*See* Settlement Agreement § 4. Because Mack is no longer an employee or director of Virpax, the injunction against Mack does not impair Virpax's rights under the Settlement Agreement.

[101] JX 638 ¶ 9(c).

| Theory | Range |
|---|---|
| **Lost Profits** | $1,448,013 – $12,708,522 |
| **Unjust Enrichment** | $6,709,694 |
| **Reasonable Royalty** | $5,978,807 – $6,709,694 |

In reaching his opinions, Lakdawalla assumed that all of the alleged trade secrets were, in fact, protected trade secrets that had been misappropriated.[102] Soon after trial, but before post-trial argument, Plaintiffs abandoned their lost profits theory of damages and, instead, stood on their unjust enrichment and reasonable royalty theories of recovery. Then, Plaintiffs dropped their unjust enrichment theory following the Settlement Agreement and chose to seek a monetary recovery against Mack solely under a reasonable royalty theory.[103]

---

[102] *See id.* ¶¶ 83–85; Tr. 861:10–17 (Lakdawalla).

[103] Lakdawalla opined that Defendants were unjustly enriched in an amount equal to Scilex's entire R&D expenditures between 2012 and 2017 based on Plaintiffs' theory that all of the alleged trade secrets constituted a protectable trade secret compilation. *See* JX 638 ¶¶ 86–89; Tr. 799:22–800:16 (Lakdawalla); *Liability Op.* at *30 ("Plaintiffs argue that the documents should be considered together as one large trade secret, as they are the cumulative result of all of Scilex's research and development efforts. Based on this same theory, Plaintiffs request approximately $7 million in damages, constituting the total amount expended by Scilex for research and development between 2012 and 2017."). The Liability Opinion rejected that theory. *Liability Op.* at *32. Given the court's rejection of the compilation theory and the reality that none of the Pipeline Products have been commercialized, the unjust enrichment theory of damages seems to no longer be viable. *See Ajaxo Inc. v. E\*Trade Fin. Corp.* (*Ajaxo I*), 115 Cal. Rptr. 3d 168, 183 (Cal. Ct. App. 2010) ("[W]here a defendant has not realized a profit or other calculable benefit as a result of his or her misappropriation of a trade secret, unjust enrichment is not provable within the meaning of [the CUTSA.]"); *accord Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 171 Cal. Rptr. 3d 714, 748 (Cal. Ct. App. 2014).

Under the CUTSA, a court may impose a reasonable royalty to compensate the trade secret owner for the misappropriator's unauthorized disclosure or use of a trade secret "only '[i]f neither [actual loss] damages nor unjust enrichment caused by misappropriation are provable.'" *Ajaxo I*, 115 Cal. Rptr. 3d at 183 (emphasis omitted) (alterations in original) (quoting Cal. Civ. Code § 3426.3(b)); *Cacique, Inc. v. Robert Reiser & Co., Inc.*, 169 F.3d 619, 623 (9th Cir. 1999) ("Under the plain language of the [CUTSA] and California case law, 'reasonable royalty is reserved for those instances where the court finds that neither actual damages to the holder of the trade secret nor unjust enrichment to the user [are] provable.'" (quoting *Morlife v. Perry*, 66 Cal. Rptr. 2d 731, 740 (Cal. Ct. App. 1997)).[104] Although the court is permitted to award a reasonable royalty if both lost profits and unjust enrichment are

---

[104] California law differs from the Uniform Trade Secrets Act ("UTSA") and the Delaware Uniform Trade Secrets Act ("DUTSA"), neither of which requires actual damages and unjust enrichment to be unprovable before a reasonable royalty may be awarded. *See Cacique*, 169 F.3d at 623; *compare* Cal. Civ. Code § 3426.3(b) ("If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty . . . ."), *with* UTSA § 3 (amended 1985) ("In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."), *and* 6 *Del. C.* § 2003(a) ("In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."). However, "[t]his difference pertains only to the circumstances in which a party may be eligible to receive a reasonable royalty" and "does not limit [] examination of case law from other jurisdictions related to the calculation of a reasonable royalty." *Ajaxo Inc. v. E\*Trade Fin. Corp. (Ajaxo II)*, 261 Cal. Rptr. 3d 583, 607 n.9 (Cal. Ct. App. 2020).

not provable, it is not required to do so. The use of the word "may" in Section 3426.3(b) of the CUTSA indicates that the decision to award a reasonable royalty is within the court's discretion. *See Tarrant Bell Prop., LLC v. Super. Ct.*, 247 P.3d 542, 544 (Cal. 2011) ("Under well-settled principle[s] of statutory construction, we ordinarily construe the word 'may' as permissive and the word 'shall' as mandatory . . . ." (alteration in original) (internal quotation marks omitted)); *Ajaxo II*, 261 Cal. Rptr. 3d at 611 (observing the statutory authority to award a reasonable royalty, if any, is within the discretion of the trial court); *Atl. Inertial Sys. Inc. v. Condor Pac. Indus. of Cal., Inc.*, 2015 WL 3825318, at *4 n.3 (C.D. Cal. June 18, 2015) ("[B]oth the plain language of the CUTSA, and *Ajaxo* itself, demonstrate that [a reasonable royalty] award is discretionary, not mandatory.").

Determining a reasonable royalty "rests on a legal fiction." *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1159 (6th Cir. 1978); *accord Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1180 (N.D. Cal. 2010); *Cal. Safe Soil, LLC v. KDC Agribusiness, LLC*, 2025 WL 98479, at *28 n.399 (Del. Ch. Jan. 10, 2025). The royalty attempts to account for "a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff." *Ajaxo I*, 115 Cal. Rptr. 3d at 179 (quoting *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 451 (2d Cir. 1998)); *see Bouchat v. Balt. Ravens Ltd. P'ship*, 2012 WL 6738321, at *4

33

n.7 (D. Md. Dec. 27, 2012) ("[T]he hypothetical negotiation approach attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before [the misappropriation] began."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (explaining that the hypothetical negotiation is the "more common approach" for calculating a reasonable royalty).[105] To reach that result, the court attempts to approximate the price that would be reached in an arm's length negotiation for the misappropriated trade secrets. *See Ajaxo II*, 261 Cal. Rptr. 3d at 607–08; *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1116 (N.D. Cal. 2011) ("This hypothetical construct seeks the percentage of sales or profit likely to have induced the hypothetical negotiators to license use of the invention." (internal quotation marks omitted)). The process involves a "high degree of artificiality." *Cal. Safe Soil*, 2025 WL 98479, at *28 (quoting *Mobil Oil Corp. v. Amoco Chems. Corp.*, 915 F. Supp. 1333, 1341

---

[105] "Case law addressing royalty damages for misappropriating trade secrets is sparse." *AirFacts, Inc. v. Amezaga*, 30 F.4th 359, 367 (4th Cir. 2022). As a result, "[i]t is generally accepted that the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement." *Cal. Safe Soil*, 2025 WL 98479, at *27 n.383 (internal quotation marks omitted); *see MedImpact Healthcare Sys., Inc. v. IQVIA Hldgs. Inc.*, 2022 WL 5460971, at *9 (S.D. Cal. Oct. 7, 2022) ("Because caselaw addressing calculation of reasonable royalty [for trade secret misappropriation] is limited, courts have adopted the reasonable royalty rates in intellectual property cases."); *Ajaxo II*, 261 Cal. Rptr. 3d at 608 ("Given the difficulty of assessing damages in trade secret cases, courts have frequently analogized damages in a trade secret action to those measures of damages usually employed in patent infringement cases." (internal quotation marks omitted)).

(D. Del. 1994)).  One court has described it as "a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge."  *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004).

To determine a reasonable royalty, many courts look to the 15 factors identified in *Georgia-Pacific Corp. v. U. S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pacific Corp. v. U. S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).  *See Cal. Safe Soil*, 2025 WL 98479, at *28 (observing that in determining a reasonable royalty for trade secret misappropriation, "courts consider fifteen factors set out in the seminal patent case *Georgia-Pacific*"); *Telemac Corp. v. US/Intelicom, Inc.,* 185 F. Supp. 2d 1084, 1100 (N.D. Cal. 2001) ("*Georgia–Pacific* sets forth fifteen factors the courts generally consider in a reasonable-royalty analysis.").[106]  "Though derived from a patent case, the *Georgia-Pacific* factors are commonly referenced in trade secret reasonable royalty discussions." *Ajaxo II*, 261 Cal. Rptr. 3d at 608; *see, e.g.*, *02 Micro Int'l Ltd.*

---

[106] As this court recently explained, the first *Georgia-Pacific* factor "considers actual royalties the owner received for licensing the technology." *Cal. Safe Soil*, 2025 WL 98479, at *28.  The other fourteen factors "look to 'the licensor's established policy and marketing program to maintain his patent monopoly,' '[t]he duration of the patent and term of the license,' 'the nature of the patented invention,' 'the extent to which the infringer has made use of the invention,' and the 'opinion testimony of qualified experts,'" among other considerations.  *Id.* (alteration in original) (quoting *Georgia-Pac.*, 318 F. Supp. at 1120).

*v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005) (considering *Georgia-Pacific* factors and awarding reasonable royalty under the CUTSA), *aff'd*, 221 Fed. Appx. 996 (Fed. Cir. 2007).

Other courts use the factors identified in *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974). *See, e.g.*, *AirFacts, Inc. v. de Amezaga*, 2022 WL 17584258, at *7 (D. Md. Dec. 12, 2022); *Ajaxo II*, 261 Cal. Rptr. 3d. at 627–28 (affirming the trial court's reasonable royalty determination based on the *University Computing* factors). These factors are: (1) "the resulting and foreseeable changes in the parties' competitive posture"; (2) "th[e] prices past purchasers or licensees may have paid"; (3) "the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business"; (4) "the nature and extent of the use the defendant intended for the secret"; and (5) "other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes." *Univ. Computing*, 504 F.2d at 539.[107] Some of the factors

---

[107] *University Computing* was decided under Georgia common law, not the UTSA. *See Univ. Computing*, 504 F.2d at 534 (examining Georgia law). Since the adoption of the UTSA, courts have debated whether damages are available for mere disclosure of a misappropriated trade secret or whether use is required. *Compare Univ. Computing*, 504 F.2d at 539 (holding "defendant must have actually put the trade secret to some commercial use" in order for plaintiff to recover for misappropriation), *with Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1186 (10th Cir. 2014) (holding that a plaintiff seeking a reasonable

36

overlap with the *Georgia-Pacific* factors, and some are not relevant to every case. *See Storagecraft*, 744 F.3d at 1189.  Indeed, they have been described as providing a "flexible analytical framework" for determining a reasonable royalty.  *Ajaxo II*, 261 Cal. Rptr. 3d at 627–28.

Under either framework, the optimal starting point is a real-world comparable license.  *See id.* at 608 ("Where there is a real-world comparable close on point, the court may view that as the starting point for the hypothetical negotiation.  The court may then adjust upward or downward for other comparable data points, including, where appropriate, the *Georgia-Pacific* factors."  (citation and internal quotation marks omitted)); *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1047 (S.D. Cal. 2023) ("In determining a reasonable royalty, parties frequently rely on comparable license agreements."  (internal quotation marks omitted)).

Ultimately, "a reasonable royalty analysis requires a court to hypothesize, not to speculate."  *Viasat, Inc. v. Space Sys./Loral, Inc.*, 2014 WL 3896073, at *8 (S.D. Cal. Aug. 8, 2014) (internal quotation marks omitted).  Although the analysis involves "an element of approximation and uncertainty," the court "must have some factual basis for a determination of a reasonable royalty."  *Unisplay, S.A. v. Am.*

---

royalty was not required to prove the defendant put a trade secret to commercial use under Utah law), *and AirFacts*, 30 F.4th at 367 (same, under Maryland law).  The parties here do not address whether actual use is a requirement for an award of a reasonable royalty under California law.  The court assumes for purposes of this opinion that it is not.

*Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995); *accord MedImpact Healthcare*, 2022 WL 5460971, at \*9. "The plaintiff fulfills its burden of proving damages by showing the misappropriation, the subsequent commercial use, and introduces evidence by which the jury can value the rights the defendant has obtained." *Ajaxo II*, 261 Cal. Rptr. 3d at 628 (emphasis omitted) (quoting *Univ. Computing*, 504 F.2d at 545).

### i.      Lakdawalla's reasonable royalty analysis

Lakdawalla relied on the *University Computing* factors in his expert report.[108] Lakdawalla conceded both in his expert report and at trial that there are no comparable licenses available to inform the royalty analysis.[109] In the absence of a comparable license, Lakdawalla employed a two-step approach to establishing a reasonable royalty.[110]

---

[108] The Defendants did not take issue with that selection and did not mention the *Georgia-Pacific* factors in their briefing. Therefore, the court will consider the reasonable royalty argument in light of the *University Computing* factors.

[109] JX 638 ¶ 95 ("I understand Plaintiffs have never licensed the trade secrets to a competitor, and I am not aware that Defendants have ever in-licensed intellectual property comparable to the trade secrets. I am also not aware of any license agreements for comparable information between any two pharmaceutical competitors, whether related to this litigation or not."); *id.* ¶ 109 ("I am not aware of any licenses for these or any related trade secrets between Scilex and Virpax or any other parties."); Tr. 864:6–11 (Lakdawalla) ("Q. You did not examine any comparable licenses or transactions in undertaking your reasonable royalty analysis; correct? A. I . . . did not examine any comparable ones, because I didn't find any. That's correct.").

[110] JX 638 ¶¶ 94–113.

In the first step of his reasonable royalty analysis, Lakdawalla created a reasonable royalty range bounded by what he described as the minimum amount that Plaintiffs would accept in a hypothetical negotiation for a non-exclusive license for Scilex's trade secrets and the maximum amount that Defendants would be willing to pay for that license.[111] Lakdawalla referred to the range as the "zone of potential agreement."[112] Lakdawalla opined that the minimum amount that Plaintiffs would accept as a royalty would be "Scilex's expected lost profits at the time of the hypothetical negotiation."[113] Lakdawalla then calculated Scilex's lost profits damages caused by Virpax's ability to launch Epoladerm with the benefit of the alleged trade secrets.[114] In making his calculations, Lakdawalla assumed that Virpax had a 47-month head start in developing Epoladerm, which is the time period that

---

[111] *Id.* ¶¶ 97–114; Lakdawalla Dep. at 127:3–13 ("So the framework for this analysis is one that is typical in the economics literature for studying bilateral negotiations between two parties, and, as such, the approach is to calculate the minimum acceptable price that a seller -- in this case this would be Scilex that is licensing out the trade secrets – and the maximum acceptable price to the buyer. . . . [T]hose two quantities . . . represent[] the set of equilibrium outcomes for the negotiation between these two parties."); Tr. 803:11–13 (Lakdawalla) ("The range of reasonable royalties would then be determined by a bilateral negotiation that's assumed to take place in March of 2018.").

[112] JX 638 ¶ 102; Tr. 804:6–8 (Lakdawalla) ("[T]he zone of potential agreement for the reasonable royalty analysis is 6 to $6.7 million.").

[113] JX 638 ¶ 97; Tr. 862:17–22 (Lakdawalla) ("Q. [Y]our reasonable royalty analysis rests on the assumption that plaintiffs would not accept less than the profits they would lose from Epoladerm entering the market; correct? A. It rests on the result that that would be their minimum willingness to accept, that's right.").

[114] JX 638 ¶¶ 98–101.

39

he assumed it would take for Virpax to develop all of the information contained in the more than 1,000 purloined documents containing Scilex trade secrets.[115] Lakdawalla opined that Silex's lost profits were $5,978,807, and this amount "would be Scilex's minimum acceptable royalty."[116]

At the other end of the range, Lakdawalla identified what he believed to be the maximum amount that Virpax would pay for all of the alleged trade secrets.[117] Lakdawalla opined that this amount would be equal to the "cost to Virpax to recreate the trade secrets," or $6,709,694.[118] For this calculation, Lakdawalla relied exclusively on his unjust enrichment analysis, which calculated unjust enrichment damages in exactly the same amount.[119]

---

[115] *Id.* ¶¶ 98–99.

[116] *Id.* ¶ 100; Tr. 803:23–804:3 (Lakdawalla) ("Then I calculate that the lost profits to Scilex due to the 47-month acceleration of Epoladerm are roughly $6 million. That's the minimum willingness to accept, in the terminology of the economic theory of bargaining.").

[117] JX 638 ¶ 101 ("Virpax's maximum acceptable royalty would be equal to its best alternative to a negotiated agreement with Scilex. For purposes of this calculation, I assume Virpax's and Mack's next best alternative would be to develop the trade secrets independently.").

[118] *Id.*

[119] *Compare id.* ¶ 89 (calculating unjust enrichment damages of $6,709,694 in Section VIII.A of expert report), *with id.* ¶ 101 (calculating maximum royalty range as $6,709,694 and referring to the calculation of unjust enrichment damages in Section VIII.A); Tr. 804:3–6 (Lakdawalla) ("On the other hand, Virpax's willingness to pay is its avoided costs to recreate the trade secrets, which I earlier explained was $6.7 million.").

In the second step of his reasonable royalty analysis, Lakdawalla then considered whether the *University Computing* factors supported an award at the higher or lower end of his range.[120] Lakdawalla found all of the *University Computing* factors to be neutral except for the first factor.[121] In applying the first factor, Lakdawalla concluded that Virpax's competitive posture would be improved through a license for the trade secrets, thus warranting a reasonable royalty "nearer to the top end of the zone of potential agreement"—*i.e.*, up to $6.7 million.[122]

### ii.     A reasonable royalty is not warranted.

Having considered the *University Computing* factors and Lakdawalla's expert report, the court is not persuaded that a reasonable royalty is appropriate here. Plaintiffs' royalty theory suffers from at least two significant, if not fatal, flaws. First, under the CUTSA, a reasonable royalty is only available if neither lost profit damages nor unjust enrichment damages are provable. Cal. Civ. Code § 3426.3(b); *see Ajaxo I*, 115 Cal. Rptr. 3d at 179 ("It is settled that, in fashioning a pecuniary remedy under the CUTSA . . . the trial court may order a reasonable royalty *only*

---

[120] JX 638 ¶ 103 ("To assess whether the hypothetical negotiation between Plaintiffs and Defendants would produce a royalty at the low or high end of this range, I qualitatively assess and discuss the five factors set forth in *University Computing*[.]"); Tr. 804:12–805:9 (Lakdawalla testifying he relied on the *University Computing* factors in reasonable royalty analysis).

[121] *See* JX 638 ¶¶ 103–13.

[122] *Id.* ¶¶ 107–08; Tr. 805:5–9 (Lakdawalla) ("For those two reasons, by [*University Computing*], my conclusion is that you get a number towards the higher end of the range, and for the other four factors, I concluded they were either neutral or not applicable.").

where neither actual damages to the holder of the trade secret nor unjust enrichment to the user is provable." (emphasis added) (internal quotation marks omitted)). Plaintiffs make no argument that both lost profits and unjust enrichment are unprovable. Instead, Plaintiffs abandoned their lost profits theory without explanation after trial. Plaintiffs then dropped their unjust enrichment theory after the court held in the Liability Opinion that only five documents contained Scilex trade secret information and after they entered into the Settlement Agreement with Virpax.

Further compounding the Plaintiffs' royalty theory is its construct. Lakdawalla frames his analysis based on lost profits and unjust enrichment damages. Having taken this approach, Plaintiffs have seemingly placed themselves in a Catch-22.[123] Lakdawalla pegs his reasonable royalty to a range between his calculation of lost profits and unjust enrichment damages, which, under the CUTSA, must not be provable. If the range is not provable, the court fails to see how it can reliably serve as the basis for a fictional negotiation for a reasonable royalty award. *Cf. Unilogic, Inc. v. Burroughs Corp.*, 12 Cal. Rptr. 2d 741, 750 (Cal. Ct. App. 1992) ("Just as [plaintiff] presented no evidence of the degree of [defendant's] enrichment,

---

[123] *See* Joseph Heller, *Catch-22*, 45–46 (1994); *see also* Catch-22, Merriam-Webster, https://www.merriam-webster.com/dictionary/catch-22 (last visited July 31, 2025) ("[A] problematic situation for which the only solution is denied by a circumstance inherent in the problem or by a rule[.]").

[plaintiff] likewise presented no evidence that would allow the court to determine what royalty, if any, would be reasonable under the circumstances."). Plaintiffs concede that there is no evidence of any licenses having been paid or offered, either for Scilex's trade secrets or in any other comparable situation.[124] Thus, there was no real-world starting point for the hypothetical license negotiations that could frame the analysis. *Cf. Ajaxo I*, 115 Cal. Rptr. 3d at 183–84 (observing that evidence of negotiations between the parties on a license agreement "could have served as a starting point for the trial court's estimate of what the parties would have agreed was a fair licensing price at the time the misappropriation occurred").

Second, Plaintiffs' reasonable royalty argument overstates the extent of Mack's misappropriation. At trial, Plaintiffs maintained that Mack misappropriated thousands of documents with trade secret information. The court held in the Liability Opinion that only five documents contained Scilex trade secret information. Lakdawalla's opinion on a reasonable royalty award assumed that all of the alleged trade secrets were protected. He did not value the alleged trade secrets

---

[124] *See* Lakdawalla Dep. at 129:1–4 ("[Q.] Has Scilex ever attempted to license its trade secrets? [A.] I'm not aware of Scilex attempting to license its trade secrets."); JX 638 ¶¶ 95, 109; Tr. 859:17–22, 864:3–11 (Lakdawalla); *see also* Pls.' Remedies Opening Br. 21 (arguing the "hypothetical negotiation in this case would have been the price at which Scilex would agree to allow [] Mack to access the collection of information on the USB" and pointing to no comparable licenses).

individually or the 11 categories in which the Plaintiffs grouped them at trial.[125]  In other words, Lakdawalla's analysis is not tailored to the trade secrets that the court found to have been misappropriated in the Liability Opinion.  Instead, it supposes imposition of a royalty on broad swaths of information that do not qualify as trade secrets.

Under the circumstances present here, the court cannot award a reasonable royalty.  Although *University Computing* offers a "flexible and imaginative approach" to assess a reasonable royalty, it does not "absolve [Plaintiffs] as the aggrieved part[ies] of the burden to demonstrate the evidentiary basis for the reasonable royalty sought."  *Ajaxo II*, 261 Cal. Rptr. 3d at 628 (internal quotation marks omitted).  Plaintiffs have not met their evidentiary burden.  Therefore, the court is in no position to award a discretionary royalty remedy.

### iii.      Exemplary damages

Plaintiffs also seek an award of exemplary damages as a remedy for Mack's trade secret misappropriation.  Under the CUTSA, the court may, if willful and malicious misappropriation exists, award exemplary damages in an amount not exceeding twice the amount of any award made under Section 3426.3(a) or (b).  Cal.

---

[125] Tr. 858:10–16 (Lakdawalla) ("Q.  [Y]ou did not conduct any analysis to determine what of those R&D expenses were associated with the development of trade secrets; correct?  A.  I did not apportion the R&D expenditures to the individual trade secrets, that's correct."); *id.* at 861:3–20 (Lakdawalla testifying that he did not conduct an analysis of the trade secrets individually or by category); *id.* at 864:12–15 (same).

Civ. Code § 3426.3(c); *Applied Med. Distrib. Corp. v. Jarrells*, 319 Cal. Rptr. 3d 205, 234 (Cal. Ct. App. 2024) ("The [CUTSA] authorizes an award of exemplary damages for willful and malicious misappropriation."). Having concluded that a reasonable royalty is not warranted in this case, the court, in its discretion, declines to award Plaintiffs exemplary damages.

### 4. Attorneys' fees

Plaintiffs seek their attorneys' fees and expenses based on Mack's breaches of the duty of loyalty and his misappropriation of trade secrets. "Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation." *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del. 1998). As an exception to the American Rule, this court has the authority to award attorneys' fees and expenses as a component of a damages award for the breach of the duty of loyalty. *See In re Nine Sys. Corp. S'holders Litig.*, 2015 WL 2265669, at *2 (Del. Ch. May 7, 2015) ("In awarding fees, whether as a proxy for unquantifiable damages or as a traditional fee award, Delaware courts have considered a need 'to discourage outright acts of disloyalty' and to avoid penalizing plaintiffs 'for bringing a successful claim against the [defendants] for breach of their fiduciary duty of loyalty.'" (alteration in original) (quoting *William Penn P'ship v. Saliba*, 13 A.3d 749, 759 (Del. 2011))). A fee award is appropriate when the

45

fiduciary has engaged in an "egregious breach of the duty of loyalty," but damages therefrom are "not readily capable of quantification." *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001); *accord Metro Storage*, 275 A.3d at 868.

Under the CUTSA, a trial court may award reasonable attorneys' fees and costs to the prevailing party "[i]f a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists[.]" Cal. Civ. Code § 3426.4; *Applied Med.*, 319 Cal. Rptr. 3d at 235 ("[The CUTSA] allows the trial court to award attorney fees to a plaintiff if the defendant's misappropriation of trade secrets was willful and malicious.").[126] Recoverable costs "shall include a reasonable sum to cover the

---

[126] Plaintiffs request for attorneys' fees and costs under the CUTSA is based on Mack's "willful and malicious" misappropriation of trade secrets. *See* Pls.' Post-Trial Opening Br. 60−61; Pls.' Remedies Opening Br. 24−25; Pls.' Suppl. Remedies Opening Br. 11−12. The CUTSA does not define "willful and malicious." *Applied Med.*, 319 Cal. Rptr. 3d at 235. California courts have interpreted "willful and malicious" under the CUTSA to mean that the misappropriation "was accomplished by an act implying a purpose or willingness to commit the act *and* by conduct intended to cause injury or conduct that is despicable and carried on with a willful and conscious disregard of [one's] rights[.]" *Id.*; *see id.* at 235–36 (concluding reasonable jury could have found willful and malicious misappropriation where misappropriator intentionally downloaded the plaintiff's documents in violation of his contractual obligations, "took steps to conceal his acts of misappropriation by erasing the contents of his [] computer to prevent [the plaintiff] from learning what he had done," and "targeted and purposefully misappropriated [the plaintiff's] business plans, research and development documents, sales strategies, training in formation, and customer pricing information"); *see also Ajaxo Inc. v. E*Trade Gp. Inc.*, 37 Cal. Rptr. 3d 221, 256–57 (Cal. Ct. App. 2005) (concluding misappropriation was

services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party." Cal. Civ. Code § 3426.4.[127]

In this case, Mack covertly usurped Scilex's corporate opportunities and misappropriated Scilex's confidential trade secret information. He engaged in this intentional misconduct in clear violation of his duty of loyalty.[128] Mack took affirmative steps to divert and develop Epoladerm, a competitive product to ZTlido. He took repeated actions to actively conceal these ventures from Scilex. This caused commercial harm to Scilex.[129] Mack's conduct was willful and malicious. Once

---

willful and malicious where misappropriator took the company's information, "continued to develop a product" and "pass[ed] it off as its own technology"); *Vacco*, 6 Cal. Rptr. 2d at 614 (affirming award of attorneys' fees under the CUTSA for willful and malicious misappropriation where the defendants obtained trade secret information by "copying [and] stealing plans, designs and other documents related to [the plaintiff's] products which defendants themselves wanted to produce in competition with [the plaintiff]").

[127] The DUTSA similarly provides for fee-shifting. *See* 6 *Del. C.* § 2004 ("If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or wilful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."); *see also Agilent Techs.*, 2010 WL 610725, at *34 (awarding attorneys' fees for willful and malicious misappropriation under DUTSA).

[128] Mack's conduct also violated his contractual obligations under the RCA. The RCA does not provide for fee-shifting. *See* JX 185. Although the court does not award attorneys' fees directly for Mack's violation of the RCA, it is worth noting that the facts underlying Plaintiffs' contractual, fiduciary, and statutory claims overlapped in many respects.

[129] *See Liability Op.* at *33 & n.264 (finding Mack concealed his ventures with Virpax from key Sorrento and Scilex personnel and collecting evidence from the trial record).

47

Mack's conduct was revealed and litigation was commenced, he deleted hundreds of relevant documents and denied having done so, even suggesting that his own children might be to blame.[130] At trial, Mack continued to obfuscate and provided self-serving testimony that strained credulity.[131] Mack's litigation misconduct made this case more difficult and more expensive for the Plaintiffs.[132]

Mack is in no position to claim that he should bear no responsibility for his actions or the costs that Plaintiffs incurred in exposing him as a disloyal fiduciary, misappropriator, and spoliator. The harm to Plaintiffs resulting from Mack's fiduciary and statutory breaches is difficult to quantify, due in large part to the nascent stage at which the Pipeline Products are in their development and the uncertainty of commercialization. But Plaintiffs should not be penalized for acting promptly to protect their rights, rather than waiting until the Pipeline Products reach the market before seeking judicial relief.

---

[130] *See id.* at *10 ("At trial, Mack attempted to obscure the clear inference to be drawn from the facts presented by arguing that anyone in his family could have accessed the USB. Even the most gullible reader would not believe that anyone other than Mack deleted these files, which were deleted in 26 separate actions over a 20-minute period." (footnote omitted)); Tr. 637:12–639:11 (Mack).

[131] *See Liability Op.* at *10; *id.* at *25–26 (finding Mack's testimony to be "self-serving" and "not credible").

[132] For example, Plaintiffs needed to retain a digital forensics expert to confront and expose Mack's pervasive accessing of Scilex documents and then deleting documents after this litigation was filed. *See, e.g.*, JX 581; JX 621; Tr. 682–727 (Faulker).

The court's "discretion is broad in fixing the amount of attorneys' fees to be awarded." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005); *see also EnerTrode, Inc. v. Gen. Capacitor Co.*, 2019 WL 1715170, at \*10 (N.D. Cal. Apr. 17, 2019) ("[T]he decision of whether and to what extent to award attorneys' fees in a California trade secret case is committed to the trial court's discretion."). In exercising its discretion, the court concludes that partial fee-shifting is appropriate as a component of the damages remedy necessary to make the Plaintiffs whole. *See Cantor Fitzgerald*, 2001 WL 536911, at \*6; *Metro Storage*, 275 A.3d at 868. The court is mindful that Plaintiffs were only partially successful in their pursuit of claims that, in many respects, arose from a common factual predicate and that Mack's conduct increased the cost of this litigation. Plaintiffs are awarded one-third of their reasonable attorneys' fees and expenses in pursuing this litigation. For the avoidance of doubt, this is not a liability for which Virpax is jointly and severally liable. If the parties are unable to reach an agreement, Plaintiffs shall submit a Rule 88 affidavit detailing their reasonable attorneys' fees and expenses within ten business days of this opinion.

**D.     Settlement Credit Under the DUCATA**

Mack argues that the court must reduce any monetary damages award by the amount of consideration paid by Virpax for its release in the Settlement Agreement under the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA").[133]

The DUCATA "codified the right of contribution among joint tortfeasors and created the legal framework that applies when a plaintiff releases only some joint tortfeasors through a settlement." *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 407 (Del. 2024).   The underlying policy of DUCATA is that "each joint tortfeasor will bear its proportionate share of responsibility, either through contribution or a settlement credit against the remaining joint tortfeasor's liability." *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 316 A.3d 359, 382 (Del. Ch. 2014), *rev'd on other grounds*, --- A.3d ----, 2025 WL 1693491 (Del. June 17, 2025). Section 6304(a) of DUCATA provides:

> A release by the injured person of 1 joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasor unless the release so provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

10 *Del. C.* § 6304(a).

---

[133] Mack's Suppl. Remedies Answering Br. 6.

The Settlement Agreement does not contain a release discharging Mack from any liability to Plaintiffs.[134] Nor does the Settlement Agreement specify the amount or proportion by which Plaintiffs' claims against Mack shall be reduced. Although the Liability Opinion did not expressly determine that Mack and Virpax were joint tortfeasors, Plaintiffs and Virpax have conceded that any monetary damages award against Mack must be reduced by the amounts Plaintiffs received from Virpax for its release.[135]

The only claim for which the court has awarded damages is Mack's breach of his duty of loyalty. The court determined that the total monetary damages are $540,576. Therefore, as a result of the Settlement Agreement, Mack is not liable for damages to Plaintiffs.

---

[134] *See* Settlement Agreement § 6 ("For the avoidance of doubt, Defendant Anthony Mack, Virpax's former CEO and Chairman, is not included in this release and Sorrento and Scilex reserve the ability to pursue all Claims against [] Mack.").

[135] Pls.' Suppl. Remedies Opening Br. 3–4 ("Plaintiffs recognize that under the [DUCATA], Plaintiffs' claims against [] Mack are reduced by the $6 million payment that Plaintiffs will receive from Virpax."); Dkt. 259 at 10 (Virpax acknowledging settlement credit under the DUCATA in post-settlement briefing); Dkt. 278 at 9:6–7 ("Mack is entitled to offset the $6 million payment from any damages award."). The parties disagree over whether Mack is entitled to an offset equal to the value of the 6% running royalty on the Pipeline Products. *See id.* at 9:8–10 ("Mack is [not] entitled to any further offset for Virpax's agreement to pay the 6 percent royalty[.]"); Mack's Suppl. Remedies Answering Br. 6 (arguing Plaintiffs "focus solely on the $6 million payment from Virpax[] and ignore the 6% royalty"). Because the amount of damages being awarded against Mack is significantly below $6.0 million, the court need not resolve the parties' disagreement over this issue.

## III. CONCLUSION

Mack is not liable for damages to Plaintiffs for breach of the RCA or for misappropriation of trade secrets under the CUTSA. The RCA shall remain in effect for 18 months and 27 days from the date of this opinion. Mack is permanently enjoined from using or disclosing any of the trade secret information for which the court found that he misappropriated, and he shall destroy any of the documents in his possession that contain the trade secret information identified in the Liability Opinion.

Plaintiffs proved damages in the amount of $540,576 for Mack's breaches of his duty of loyalty. Under the Settlement Agreement, that amount is reduced to zero.

Plaintiffs are awarded one-third of their reasonable attorneys' fees and expenses incurred in this litigation. Mack is individually liable for this amount and shall not receive any credit under the Settlement Agreement. If the parties are unable to reach an agreement on the amount of fees, Plaintiffs shall submit a Rule 88 affidavit within ten business days of this opinion.